NATIONAL ABORTION FEDERATION, Mark I. Evans, M.D., Carolyn Westhoff, M.D., M.SC., Cassing Hammond, M.D., Marc Heller, M.D., Timothy R.B. Johnson, M.D., Stephen Chasen, M.D., Gerson Weiss, M.D., on behalf of themselves and their patients, Plaintiffs,

v.

John ASHCROFT, in his capacity as Attorney General of the United States, along with his officers, agents, servants, employees, and successors in office, Defendant.

No. 03 CIV. 8695(RCC).

United States District Court, S.D. New York.

Aug. 26, 2004.

See, also, 362 F.3d 923.

A. Stephen Hut, Jr., Amy Kreiger Wigmore, Kimberly A. Parker, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, Julie Ellen Sternberg, Susan Talcott Camp, Louise Frances Melling, ACLUF, Rebekah Diller, New York Civil Liberties Union Foundation, New York, NY, Lorie A. Chaiten, the Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, for Plaintiffs.

Elizabeth Wolstein, Joseph Anthony Pantoja, Sean H. Lane, Sheila Marie Gowan, U.S. Attorney's Office, New York, NY, for Defendant.

### OPINION & ORDER

CASEY, District Judge.

## TABLE OF CONTENTS

Page

I. BACKGROUND ...................................................... 439
  A. The Act ......................................................... 439
  B. Procedural History of This Case ................................ 441
  C. The Congressional Record ...................................... 443
    1. 104th Congress ............................................ 443
      (a) June 1995 House Hearing ............................... 443
      (b) November 1995 Senate Hearing .......................... 444
      (c) March 1996 House Hearing .............................. 445
    2. 105th Congress ............................................ 445
    3. 106th Congress ............................................ 446
    4. 107th Congress ............................................ 446
    5. 108th Congress ............................................ 448
    6. Views of Advocacy and Medical Associations ................ 449
      (a) Associations Opposing the Act ......................... 449
      (b) Associations Supporting the Act ....................... 452
      (c) The American Medical Association ...................... 452
  D. Stenberg v. Carhart ........................................... 452
    1. The Nebraska Statute ...................................... 453
    2. The Majority Opinion ...................................... 453

(a) The Facts before the Court ........................................453
(b) The Court's Legal Analysis......................................454
3. The Concurring Opinions..........................................457
4. The Dissenting Opinions .........................................457
E. Trial Experts ......................................................458
1. Plaintiffs' Experts ............................................458
2. The Government's Experts .......................................462
F. Abortion Procedures................................................464
1. D & E .........................................................464
2. D & X .........................................................465
3. Induction .....................................................467
4. Hysterectomy and Hysterotomy ...................................467
G. Trial Testimony Regarding Comparative Safety of Abortion
    Procedures .......................................................467
1. Comparison of D & E to Induction ..............................467
2. Comparison of D & X to D & E ..................................470
H. Testimony Regarding Possibility of Effecting Fetal Demise
    Prior to Abortion Procedure ......................................474
I. Trial Testimony Regarding Congress's Factual Findings .............475
1. Congress's Findings Regarding the Risks of "Partial–Birth
    Abortion" .......................................................475
2. Congress's Findings Regarding Other Aspects of "Partial–Birth
    Abortion" .......................................................478

II. FINDINGS OF FACT .................................................479

III. CONCLUSIONS OF LAW .............................................482
A. The Court Only Reaches the Health–Exception Issue.................482
B. Level of Deference Owed to Congressional Findings.................483
C. The Act Requires a Health Exception ..............................487

IV. CONCLUSION ......................................................492

Plaintiffs, a non-profit organization providing abortion services, and seven individual physicians, seek to permanently enjoin enforcement of the Partial–Birth Abortion Ban Act of 2003, 18 U.S.C. § 1531 (the "Act"), which imposes potential criminal and civil penalties if a physician performs a certain abortion procedure. The Act bans the procedure called "partial-birth abortion," and exempts from its prohibition only those abortions necessary to save the life of the mother. This medical procedure has been described by many, including Justices of the Supreme Court, as gruesome, inhumane, brutal, and barbaric. Plaintiffs challenge the Act on the grounds that the Constitution requires an exemption to permit the procedure when it is necessary to preserve maternal health; the Act imposes an undue burden on a woman's right to choose an abortion; it is unconstitutionally vague; the Act fails to serve any legitimate state interest; the life exception is constitutionally insufficient; and the Act violates women's rights to equal protection of the laws.

## I. BACKGROUND

### A. The Act

The Act prohibits any physician in the United States, "in or affecting interstate or foreign commerce [from] knowingly perform[ing] a partial-birth abortion." [1] 18 U.S.C. § 1531(a). Partial-birth abortion is defined under the Act as:

---

1. Plaintiffs do not allege that Congress exceeded its authority under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, when it passed the Act.

an abortion in which the person performing the abortion (A) deliberately and intentionally vaginally delivers a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother, for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus; and (B) performs the overt act, other than completion of delivery, that kills the partially delivered living fetus.

*Id.* § 1531(b)(1).[2] The Act applies regardless of the stage of pregnancy and thus bans partial-birth abortions both before and after fetal viability.[3]

The Act subjects physicians to possible criminal and civil penalties. A violation of the statute constitutes a felony that carries a sentence of not more than two years' imprisonment, and/or a fine of not more than $ 250,000.[4] *Id.* § 1531(a); *see also id.* § 3571(b)(3). In terms of potential civil liability, the Act allows the putative "father" of the fetus (if he is married to the woman) or the putative "maternal grandparents of the fetus" (if the woman has not

**2.** Terms also used to describe the procedure include "dilation and extraction" or "D & X," "intact dilation and evacuation" (as opposed to dilation and evacuation, "D & E," not involving intact removal of the fetus), "intact D & X," "intact dilation and extraction," "intact dilation and evacuation," the "intact variation of D & E," and "the breech extraction variant of D & E." (Trial Transcript [Tr.] 751:5–12, 947:16–21, 949:1–950:5, 950:13–24 (Westhoff); Tr. 1221:22–24 (Frederiksen).) Dr. Martin Haskell first used the term "dilation and extraction" or "D & X" to describe the procedure in a 1992 paper entitled *Dilation and Extraction for Late Second Trimester Abortion*, which was presented at a National Abortion Federation seminar. (*Partial–Birth Abortion: Hearing Before the Subcommittee on the Constitution of the House Committee on the Judiciary*, 104th Cong. 15 (June 15, 1995) [June 1995 Hearing].) As one physician who submitted written testimony to Congress stated, "[T]here is no uniformly accepted medical terminology for the [abortion] method that is the subject of this legislation." (*Partial–Birth Abortion Ban Act of 2002: Hearing Before the Subcommittee on the Constitution of the House Committee on the Judiciary*, 107th Cong. 52 (July 9, 2002) [July 2002 Hearing] (testimony of Dr. Pamela Smith); *see also id.* at 236 (letter from Physicians' Ad Hoc Coalition for Truth ("PHACT") to the American College of Obstetricians and Gynecologists ("ACOG")) (stating that there is "no agreement, even among proponents of [partial-birth abortion], as to what to call it."); *Partial–Birth Abortion: Joint Hearing Before the Senate Committee on the Judiciary and the*

*Subcommittee on the Constitution of the House Committee on the Judiciary*, 105th Cong. 121 (March 11, 1997) [March 1997 Hearing] (testimony of Dr. Curtis Cook.).) However, "partial-birth abortion" is a frequently used legal term as demonstrated by the many state statutes to employ it. *See Stenberg v. Carhart*, 530 U.S. 914, 994–95, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (Thomas, J., dissenting) (noting Congress's and twenty-eight state legislatures' use of term "partial-birth abortion").

The Court will refer to the procedure as D & X. In doing so, the Court does not suggest either that the Act narrowly defines the term "partial-birth abortion" so as to prohibit only D & X or that the Act is so broad as to encompass D & E. For a more detailed discussion of the steps involved in the D & X procedure, as well as the D & E procedure, see *infra* section I.F.

**3.** Viability "is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb." *Planned Parenthood v. Casey*, 505 U.S. 833, 870, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion). A fetus is generally viable between twenty-three and twenty-four weeks from the first day of the woman's last menstrual period ("LMP"). (Tr. at 766:3–6 (Westhoff); Tr. at 1163:1–3 (Frederiksen); Tr. at 1718:10–15, 1740:6–18 (Lockwood).)

**4.** The mother of the aborted fetus is explicitly exempted from prosecution. *See* 18 U.S.C. § 1531(e).

attained the age of eighteen) to "obtain appropriate relief" in a civil action, "unless the pregnancy resulted from the plaintiff's criminal conduct or the plaintiff consented to the abortion." *Id.* § 1531(c)(1). Such relief may include: "(A) money damages for all injuries, psychological and physical, occasioned by the violation of [the Act]; and (B) statutory damages equal to three times the cost of the partial-birth abortion." *Id.* § 1531(c)(2).

The Act permits a partial-birth abortion if it is necessary to preserve maternal life. The life exception states, "This subsection does not apply to a partial-birth abortion that is necessary to save the life of a mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." *Id.* § 1531(a). The Act bans the procedure in all other instances.

The Act does not include a health exception because Congress determined that partial-birth abortion is never medically necessary to preserve maternal health and, in fact, may pose serious health risks to the mother. Congress therefore concluded that a health exception was unnecessary and made several findings to this effect. In section 2(14) of the Act, Congress found that "partial-birth abortion is never medically indicated to preserve the health of the mother; is in fact unrecognized as a valid abortion procedure by the mainstream medical community; [and] poses additional health risks to the mother." § 2(14)(O), Pub.L. No. 108–105, 117 Stat. 1201, 1206. Congress also concluded that there is "no credible medical evidence that

partial-birth abortions are safe or are safer than other abortion procedures" and that "a ban on partial-birth abortion is not required to contain a 'health' exception, because the facts indicate that a partial-birth abortion is never necessary to preserve the health of a woman." *Id.* §§ 2(13), 14(B), 117 Stat. at 1203–04; *see also id.* § 1, 117 Stat. at 1201 (finding that partial-birth abortion is "never medically necessary and should be prohibited"); *id.* § 2(2), 117 Stat. at 1201 (concluding that "partial-birth abortion remains a disfavored procedure that is not only unnecessary to preserve the health of the mother, but in fact poses serious risks to the long-term health of women"); *id.* § 5, 117 Stat. at 1202 (declaring that "a partial-birth abortion is never necessary to preserve the health of a woman"); *id.* § 14(F), 117 Stat. at 1205 (reasoning that "[a] ban on the partial-birth abortion procedure will therefore advance the health interests of pregnant women seeking to terminate a pregnancy"); *id.* § 14(G) (finding that the prohibition will "promot[e] maternal health"). Finally, Congress found that "[a] moral, medical, and ethical consensus exists that the practice of performing a partial-birth abortion ... is never medically necessary and should be prohibited." *Id.*, § 2(1), 117 Stat. at 1201.

The President signed the Act into law on November 5, 2003, and it went into effect at 12:01 a.m. the following day. *See* 18 U.S.C. § 1531(a) (stating that the Act would take effect one day after enactment).

### B. Procedural History of This Case

Plaintiffs initiated this action on November 4, 2003, asserting several constitutional defects.[5] First, Plaintiffs contend that the

---

**5.** Plaintiffs initiated an identical case on October 31, 2003, which was assigned to this Court as civil action number 03 Civ. 8602. Following the Government's motion that claims in that case were not ripe for review because the President had not yet signed the Act, the case was dismissed without prejudice. When the President publicly announced his intention to sign the Act into law, Plaintiffs initiated this case. On January 6, 2004, Plaintiffs supplemented the complaint by pleading the fact that the President had signed the Act on November 5, 2003. (Sup-

Act violates the Fifth Amendment's Due Process Clause by failing to provide a health exception from its proscription of partial-birth abortion. (Compl.¶¶ 49–52.) Plaintiffs also challenge the Act on the grounds that it: (1) contains an inadequate life exception; (2) defines the term "partial-birth abortion" so broadly as to also ban D & E and induction termination [6]—other methods of second trimester abortion involving vaginal delivery of the fetus—and thus imposes an undue burden on a woman's right to reproductive choice; (3) is impermissibly vague in defining the banned conduct; (4) fails to serve a legitimate state interest; and (5) violates women's right to equal protection guaranteed by the Fifth Amendment. (*Id.* ¶¶ 53–60.) If Plaintiffs are correct on any one of these grounds, the Act is unconstitutional and must be permanently enjoined. *See, e.g., Stenberg v. Carhart,* 530 U.S. 914, 930, 937, 946, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); *Planned Parenthood Fed'n of Am. v. Ashcroft,* 320 F.Supp.2d 957, 960, 1034–35 (N.D.Cal.2004).

On November 5, 2003, hours after the Act was signed into law, the Court held a hearing on Plaintiffs' application for a temporary restraining order. The following day, the Court granted Plaintiffs' application and temporarily restrained enforcement of the Act through November 21, 2003. *See National Abortion Federation v. Ashcroft,* 287 F.Supp.2d 525, 526 (S.D.N.Y.2003). On November 10, 2003, the Government requested that the Court consolidate the proceedings on the preliminary and permanent injunctions, and set a hearing date within 120 days to permit a period of expedited discovery. Plaintiffs

consented to this proposal, provided that they were permitted to move for summary judgment on their claim that the Act was unconstitutional for lack of a health exception. On November 18, 2003, the Court ordered the parties to engage in expedited discovery preceding a consolidated hearing. In addition, Plaintiffs were granted permission to file their proposed summary judgment motion. Upon the Government's consent, the Court extended the temporary restraining order until March 19, 2004.

On March 15, 2004, the parties stipulated that the temporary restraining order should be extended until the Court rendered its decision on the merits and issued a final judgment.[7] On March 17, 2004, the Court denied Plaintiffs' motion for summary judgment and reserved for trial the issue of whether the Act is unconstitutional for lack of a maternal health exception. *See National Abortion Federation v. Ashcroft,* 2004 WL 540470, at *5 (S.D.N.Y. Mar.17, 2004). Beginning on March 29, 2004, the Court conducted a sixteen-day bench trial, hearing testimony from twenty-two witnesses, sixteen of whom appeared in person and six via deposition.

Courts in the Northern District of California and the District of Nebraska held parallel trials in cases challenging the Act's constitutionality. As did this Court, both temporarily restrained the Act's enforcement. *See Carhart v. Ashcroft,* 287 F.Supp.2d 1015, 1016 (D.Neb.2003); *Planned Parenthood,* 320 F.Supp.2d at 967. Following a trial on the merits, the Northern District of California permanently enjoined enforcement of the Act. *See*

---

plemental Complaint for Declaratory and Injunctive Relief [Compl.] ¶ 1.)

**6.** For a description of these procedures see *infra* section I.F.

**7.** Although the parties so stipulated, the Government reserved its right to request a hear-

ing as to whether the temporary restraining order should continue to be in effect before the Court issued a final judgment. The Government, however, has not requested such a hearing.

*Planned Parenthood,* 320 F.Supp.2d at 1034–35. The application for a permanent injunction remains pending in the District of Nebraska.

### C. The Congressional Record

#### 1. 104th Congress

Congress first held hearings on proposed versions of the Act during this legislative session. The House Subcommittee on the Constitution of the Judiciary Committee held two hearings while the Senate Judiciary Committee held one.

#### (a) June 1995 House Hearing

The House subcommittee held the first hearing on June 15, 1995. (H.R.Rep. No. 104–267, at 12 (1995).) Two physicians and one nurse testified in favor of a ban, while a physician and a woman who had an abortion testified in opposition. (June 1995 Hearing at iii.) The hearing lasted approximately two and one-half hours. (*Id.* at 1, 102 (recording times at which subcommittee met and adjourned).)

Dr. Pamela Smith, a board-certified obstetrician and gynecologist, testified in favor of the proposed legislation. Dr. Smith used a model to describe the D & X procedure, and her testimony concentrated on the ethical dilemmas faced by physicians who perform D & X abortions. (*Id.* at 38–39.) The doctor described the similarities between D & X and the delivery of a breech baby, arguing that because the procedure is similar to techniques used to preserve fetal life, D & X "produces a moral dilemma that is even more acute than that encountered [with D & E]." (*Id.* at 42.) Dr. Smith further testified that during her fifteen years as a physician she had never experienced a situation that necessitated a D & X procedure in order to preserve maternal life and that supporters of the procedure have not substantiated their claims that the procedure is safe. (*Id.* at 39, 40.)

Dr. Robert J. White, a brain surgeon, neuroscientist, and a professor of surgery at Case Western Reserve University, supported the ban and testified on the topic of fetal pain. (*Id.* at 38, 67.) He testified that by the twentieth week of gestation, a fetus has developed the capacity to feel pain and is possibly more sensitive to painful stimuli than at birth. (*Id.* at 67, 69.) Mary Ellen Morton, a neonatal nurse, also testified as to fetal pain. (*Id.* at 76–79.)

Dr. J. Courtland Robinson, an associate professor in the Department of Gynecology and Obstetrics at Johns Hopkins University, testified against the ban. (*Id.* at 38, 63.) Her testimony did not focus on whether D & X offered safety advantages for some women; rather, Dr. Robinson confined her testimony to her view that Congress's definition of partial-birth abortion was overly broad, as it applied to both D & E and D & X procedures. (*Id.* at 63–65.)

The subcommittee also heard testimony from Tammy Watts, a woman who previously had an abortion, and Professor David M. Smolin of Cumberland Law School, who discussed the constitutionality of the proposed legislation. (*Id.* at 38, 71–74, 97–102.)

The record of this hearing contains statements from physicians, a member of Congress, and representatives of advocacy groups. (*See id.* at 103–42.) Among those submissions is a letter from Dr. Watson A. Bowes, Jr., Professor at the University of North Carolina at Chapel Hill. (*Id.* at 104–07.) While Dr. Bowes stated that he had never witnessed a D & X, he shared his belief that fetuses feel pain during the procedure and that the proposed bill would not prohibit other, accepted medical procedures. (*See id.* at 105–06.) Dr. Martin Haskell, M.D.'s paper *Dilation and Extraction for Late Second Trimester Abortion,* which describes the procedure, was

also included in the record. (*See id.* at 4–28.)

During the House debate, additional statements by physicians were introduced. For example, Drs. Mitchell Creinin and Lewis H. Koplik, both of whom stated that they regularly perform abortion procedures, opposed a ban that lacked a health exception on the grounds that D & X is medically necessary for certain maternal health conditions and may be safer than alternative procedures. (141 Cong. Rec. H11610 (daily ed. Nov. 1, 1995).)

*(b) November 1995 Senate Hearing*

The Senate Judiciary Committee held its first hearing on the proposed ban on November 17, 1995. (*Partial–Birth Abortion: Hearing Before the Senate Committee on the Judiciary,* 104th Cong. 1 (1995) [November 1995 Hearing].)

During the approximately six-hour hearing, a total of ten witnesses testified; five of these witnesses were physicians. Two of these physicians, Drs. Smith and Robinson, had testified before the House subcommittee and reiterated their previous testimony. (*Id.* at 75–99 (Smith); *id.* at 103–05 (Robinson).) Dr. Norig Ellison, the President of the American Society of Anesthesiologists, testified that anesthesia given to a woman during a D & X would not eliminate pain to the fetus or cause fetal demise. Dr. Ellison did not voice any view as to the proposed legislation's effect on women's health. (*Id.* at 107–08.) Dr. Nancy Romer, a board-certified obstetrician and gynecologist, testified in favor of a ban and stated that during her thirteen years of practicing obstetrics, she never had a patient who required the procedure because of a maternal illness or fetal abnormality. (*Id.* at 109.) In her view, a majority of the procedures were elective. (*Id.*)

Finally, Dr. Mary Campbell, the medical director of Planned Parenthood of Metro-politan Washington, and a board certified obstetrician and gynecologist, testified against the ban. (*Id.* at 99.) She provided general background on abortion procedures and testified that the vagueness of the proposed act would have a chilling effect on the availability of abortion services and outlaw the safest way of terminating a third-trimester pregnancy. (*Id.* at 101.)

The Senate also heard testimony from Brenda Pratt Schaefer, a registered nurse, who testified about partial-birth abortions that she had observed. (*Id.* at 17–19.) Helen Alvaré, a representative of the National Conference of Catholic Bishops, testified as to the morality of partial-birth abortion, equating it with infanticide. (*Id.* at 112–15.) Finally, the committee heard from three women who experienced complications during the later stages of pregnancy and two law professors who had conflicting views as to the ban's constitutionality. (*Id.* at 158–65, 169–71, 188–90.)

Record submissions included a letter from Dr. Warren M. Hern, Assistant Clinical Professor at the University of Colorado Health Sciences Center, who stated that D & X may reduce the risk of uterine perforation and embolism of cerebral tissue into the woman's blood stream. (*See id.* at 242, 247–48.) The written testimony and letters also included statements from a senator, women who had undergone abortions, and lawyers testifying about the constitutional and policy implications of the bill. (*See id.* at 236–41, 280–335, 344–50, 352–59, 362–63.) The committee received letters from the National Abortion Federation ("NAF") (a plaintiff in this case), ACOG, the American Nurses Association ("ANA"), and Planned Parenthood Federation of America, Inc. (*See id.* at 337–40.)

During the Senate debate, a letter from Dr. Antonio Scommegna, an obstetrician and gynecologist and head of the Depart-

ment of Obstetrics and Gynecology at the University of Illinois, was introduced. (141 Cong. Rec. 17892–93.) Dr. Scommegna wrote Congress to express his view that the ban would be harmful to women's health. (*Id.* at 17892.) He recounted a specific instance in which he performed, in his view, a medically necessary D & X on a hydrocephalic fetus. (*Id.*) According to the doctor, the only option available to him other than a D & X would have significantly increased the woman's risk of infection and affected her future fertility. (*Id.*)

*(c) March 1996 House Hearing*

The final hearing of this legislative session was held on March 21, 1996, and focused exclusively on whether anesthesia administered to the mother during a D & X would result in fetal demise. (*Partial–Birth Abortion: Hearing Before the Subcommittee on the Constitution of the House Committee on the Judiciary*, 104th Cong. 1, 352 (March 21, 1996) [March 1996 Hearing].)

Four anesthesiologists testified during the six-hour hearing—Dr. Ellison (who had testified before the Senate in November 1995), and Drs. David Birnbach, David Chestnut, and Jean Wright. Each doctor stated that the administration of an anesthetic to the mother would not cause fetal demise, and therefore would not alleviate the pain a fetus endures during the D & X procedure. (*Id.* at 138–50.) Three witnesses who had testified before the Senate four months earlier presented testimony which tracked their previous statements. (*Id.* at 310–12 (statement of Brenda Pratt Shafer); *id.* at 320–24 (statement of Coreen Costello); *id.* at 331–33 (statement of Helen M. Alvaré).) In addition, the subcommittee considered the testimony of Mary–Dorothy Line, who opposed the ban while recounting her experience undergoing a D & X. (*Id.* at 326–29.)

Both the Senate and House of Representatives passed a bill banning partial-birth abortion. President Clinton vetoed the legislation. Senate attempts to override the veto failed.

**2. 105th Congress**

The 105th Congress again considered proposed legislation to ban partial-birth abortion. In a joint hearing before the House and Senate Judiciary Committees in March 1997, members of Congress heard from ten witnesses over a five-hour hearing. (March 1997 Hearing at v, 1.) Only one of these witnesses, Dr. Curtis Cook, provided testimony on whether partial-birth abortion was safer in some instances. (*Id.* at 120–22.) Three witnesses presented their personal experiences undergoing abortions and their personal views on the issue; the remaining six witnesses represented the policy-based views of advocacy groups such as the National Coalition of Abortion Providers, Planned Parenthood, the National Right to Life Committee, and the National Conference of Catholic Bishops. (*Id.* at 17–25, 31–33, 35–37, 124–31.)

Dr. Cook, a board-certified obstetrician and gynecologist and maternal-fetal medicine specialist, who also testified at trial in this case, presented his view that a health exception is not necessary. (*Id.* at 120–22.) He first described the steps involved in a partial-birth abortion. (*Id.* at 121–22.) Dr. Cook then opined that the procedure is unnecessary and potentially dangerous to maternal health, based on his view that the procedure involves: (1) the forceful placement of multiple dilators into the cervix, which could lead to cervical complications; (2) a greater risk of preterm birth; (3) an increased risk of bleeding and infection; and (4) converting the fetus into a footling breech, or feet-first, position—an obsolete obstetrics technique. (*Id.* at 122.) Dr. Cook also testified that in his experience, a partial-birth abortion is never the only

available technique, even in the face of various maternal-health conditions. (*Id.*)

The hearing record also contains statements from members of Congress and law professors, letters from advocacy groups, and medical articles. (*Id.* at 1–17, 135–43, 157–70.)

### 3. 106th Congress

During the 106th Congress, both houses debated proposed versions of the Act but neither conducted additional hearings. More noteworthy, the Supreme Court in *Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), held that Nebraska's partial-birth abortion ban was unconstitutional.[8]

### 4. 107th Congress

In 2002, Representative Steve Chabot introduced a version of the Act, asserting that it differed from previous proposals in order to address the *Stenberg* decision. (July 2002 Hearing at 2.) Specifically, Representative Chabot explained that the proposal contained a more precise definition of the prohibited procedure and that Congress's factual findings addressed why a health exception was unnecessary. (*Id.*) At the outset of the July 9, 2002 hearing, Representative Chabot stated that there existed a medical consensus that partial-birth abortion is an inhumane procedure and is never medically necessary. (*Id.* at 1.) Over the next ninety minutes, the subcommittee heard testimony from a panel that consisted of four witnesses: Dr. Aultman and Dr. Cook, both of whom previously testified before Congress, and Simon Heller and Robert Destro, attorneys who had conflicting views as to the constitutionality of the legislation. (*Id.* at 4–6.)

Dr. Aultman testified that the Act was not vague, and that even absent a health exception the proposal would not endanger women's health. (*Id.* at 6–7.) He supported the proposed legislation on the grounds that partial-birth abortion is a dangerous experimental procedure that jeopardizes women's health and blurs the line between abortion and infanticide. (*Id.* at 7.) In terms of the health exception, the doctor testified that there exist "standard alternative methods available" other than D & X to abort a fetus, such that the procedure is never medically necessary. (*Id.* at 8.) Finally, Dr. Aultman testified that a woman faced increased health risks by undergoing a D & X instead of a D & E, including increased risk of hemorrhage, infection, and cervical incompetence. (*Id.*) Dr. Aultman therefore concluded that the ban would actually safeguard women's health. (*Id.* at 9.)

Dr. Cook voiced support for the proposed legislation as well. He testified that during his ten years of practice he had never encountered a situation in which the procedure was required or safer than alternatives. (*Id.* at 26.) Dr. Cook also testified that after conversing with colleagues, he had yet to learn of an instance when a D & X was the only available option to terminate a second-trimester pregnancy. (*Id.*) Noting that the procedure was outside the mainstream of medical care, Dr. Cook explained that he was not aware of any material instructing physicians how to perform a D & X other than information presented at a NAF seminar. (*Id.*) Dr. Cook therefore supported the ban, explaining that D & X is an "unnecessary" procedure that is "potentially unsafe for women." (*Id.* at 27.)

The House subcommittee also heard from two attorneys who discussed whether the Act would survive a constitutional challenge. Professor Destro of the Catholic University of America testified that the proposed legislation would pass constitutional muster. (*Id.* at 5, 20–21.) On the other hand, Simon Heller, who represent-

---

8. *See* discussion *infra* section I.D.

ed the plaintiff in *Stenberg*, argued that the proposed legislation was unconstitutional. (*Id.* at 5, 15–16.)

The record for the 107th Congress also contains statements from members of the House of Representatives, letters from doctors, and medical papers. (*Id.* at 47–280.) In a letter dated May 19, 1997, the American Medical Association (the "AMA") indicated its support for the bill because it included a life exception and narrowly defined the prohibited procedure. (*Id.* at 124.) The AMA also stated that its expert panel could not identify any circumstances in which the procedure would be the only appropriate abortion method, and that the procedure had no history in peer-reviewed literature or in accepted medical practice. (*Id.* at 186.) The AMA's expert report on late-term pregnancy termination techniques concluded that: (1) partial-birth abortion is not a medical term, (2) D & X is a distinct procedure from D & E, and (3) D & X should not be used "unless alternative procedures pose materially greater risk to the woman." (*Id.* at 203.)

ACOG's Executive Board issued a Policy Statement Regarding Intact Dilation and Extraction on January 12, 1997, that was included in the record of the hearing.[9] According to the policy statement:

> A select panel convened by ACOG could identify no circumstances under which [D & X] would be the only option to save the life or preserve the health of the woman. [A] ... D & X, however, may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman, and only the doctor, in consultation with the patient, based upon the woman's particular circumstances can make this decision.

(*Id.* at 232.) In a Fact Sheet on the policy statement, ACOG indicated among its reasons for opposing a ban on D & X that D & X may be the most appropriate abortion procedure when the woman has sepsis, and may decrease the risk of cervical laceration and uterine rupture. (*Id.* at 241–42.)

The record for this hearing also includes a joint statement from the AMA and ACOG. (*See id.* at 220–21.) Referring to the bill then pending before Congress, the organizations jointly stated:

> Although our organizations take different positions on the legislation, with the AMA supporting the ... legislation and ACOG opposing it, we agree that each organization believed and believes the position it took furthers the best interests of patients.

(*Id.* at 220.)

In addition, a letter of September 18, 1996 to members of Congress from PHACT stated:

> [A]s doctors intimately familiar with [cases of women undergoing abortions due to fetal abnormalities], let us be very clear: *the partial-birth abortion procedure, as described by Dr. Martin Haskell (the nation's leading practitioner of the procedure), and defined in the Partial–Birth Abortion Ban Act, is never medically indicated and can itself pose serious risks to the health and fertility of women.*

(*Id.* at 184.) PHACT also responded to ACOG's 1997 Statement of Policy. (*See id.* at 236–44.) According to PHACT:

> ACOG clearly recognizes that in no circumstances is partial-birth abortion the only option for women. In other words, ACOG agrees that there are other, *medically recognized,* and standard proce-

---

**9.** For a more extended discussion of ACOG's policy statements, and the process that produced them, see *infra* section I.C.6(a).

dures available to women other than partial-birth abortion. Given ACOG's acceptance of this medical fact, [the] claim that a totally unrecognized, non-standard procedure, for which no peer-reviewed data exist, can nonetheless be the safest and most appropriate in certain situations, simply defies understanding.

. . .

In contrast, our research of the subject leads us to conclude that there are no obstetrical situations that would necessitate or even favor the medically unrecognized partial-birth abortion procedure as the safest or most appropriate option. Indeed, we have concerns that this procedure may itself pose serious health risks for women.

(*Id.* at 237.)

### 5. 108th Congress

During the 108th Congress, both houses again debated a ban on partial-birth abortion. However, only the House of Representatives conducted a hearing. On March 25, 2003, a single panel of three witnesses testified about the proposed legislation during a ninety-minute hearing. (*Partial–Birth Abortion Ban Act of 2002: Hearing Before the Subcommittee on the Constitution of the House Committee on the Judiciary*, 107th Cong. 1, 35 (March 25, 2003) [March 2003 Hearing].)

Two of the panelists, Professor Gerard V. Bradley of Notre Dame Law School and attorney Simon Heller, discussed the constitutionality of the ban. (*Id.* at. 5–6.) Professor Bradley testified that a ban lacking a health exception would survive judicial scrutiny. (*Id.* at 16–17.) As he had done the year before, Heller voiced a contrary view. (*Id.* at 10–12.)

Dr. Neerhof, an Associate Professor of Obstetrics and Gynecology from Northwestern University Medical School, provided testimony on fetal pain, the ethical dilemmas posed by partial-birth abortion, and whether partial-birth abortion offers safety advantages for some women. (*Id.* at 5–7.) Dr. Neerhof testified in support of the ban for several reasons, including his belief that partial-birth abortion poses health risks to women. He stated that a woman who undergoes a D & X faces increased risk of hemorrhage, infection, and uterine perforation and rupture. (*Id.* at 7.) Moreover, he supported the ban in light of the fact that no studies evaluated or attested to the safety of D & X. (*Id.* at 6.)

Among the statements offered into the record was a letter from Dr. Philip D. Darney, M.D., Professor at the University of California, San Francisco, and Chief of Obstetrics, Gynecology and Reproductive Services at San Francisco General Hospital. (*See id.* at 100–01.) Dr. Darney provided examples of two cases in which he believed D & X was "critical to the safe conduct of our surgery." (*Id.*) The first woman, according to Dr. Darney, had placenta previa and a blood clotting disorder; D & X was used to control the amount of blood loss. (*Id.* at 100.) The second woman also had placenta previa and three previous caesarian sections, placing her at risk of hemorrhage and hysterectomy.[10] (*Id.*) Dr. Darney claimed that D & X was used to avoid the need for hysterectomy and to reduce the amount of blood loss. (*Id.*)

Another physician, Dr. Daniel J. Wechter, M.D., Assistant Professor of Obstetrics and Gynecology at Michigan State College of Human Medicine, wrote in response to

---

**10.** As explained below, a hysterectomy involves the removal of the uterus. *See infra* section I.F.4.

Dr. Darney's letter and disagreed that D & X was necessary for the two patients described. (*See id.* at 102–03.) Dr. Wechter opined that the second patient could have delivered a healthy child by a caesarean section followed by hysterectomy. (*Id.* at 102.) Other physicians also wrote letters disagreeing with Dr. Darney's assertions, including Drs. Bowes, Steve Calvin, Nathan Hoeldtke, Byron C. Calhoun, T. Murphy Goodwin, and Susan E. Rutherford. (*See id.* at 104–13.) Other physicians wrote letters expressing their views on the medical necessity of D & X. (*See id.* at 113–19, 186–95.)

The views of medical organizations such as Physicians for Reproductive Choice and Health ("PRCH"), the American Medical Women's Association, Inc. ("AMWA"), ACOG, and PHACT were included as part of the hearing record. (*See id.* at 120–45, 197–209.) ACOG's Executive Board issued a Statement of Policy in September 2000, which reiterated its position asserted in the 1997 policy statement. (*See id.* at 197–200.) Also made a part of the hearing record was a statement from the AMA in 1999 stating that it no longer supported the legislation. (*See id.* at 212.)

In sum, forty-six physicians offered their views to the 105th through 108th Congresses surrounding the health and safety advantages of D & X. Twenty-three physicians voiced support for the ban, twenty-two opposed it, and one physician offered a neutral assessment. Of the forty-six physicians, thirty-six were trained in obstetrics and gynecology. Of this number, seventeen supported the ban, while nineteen opposed it.

During the 108th legislative session, Congress passed the bill. On March 13, 2003, the Senate passed S. 3, the Partial–Birth Abortion Ban Act of 2003, by a vote of 64 to 33. (Ex. V–6, Cong. Rec. S3658; *see also* March 2003 Hearing at 1 (statement of Rep. Chabot, Member, House Comm. on the Judiciary).) The House of Representatives passed a virtually identical bill, H.R. 760, on June 4, 2003, by a 282–to–139 vote. (Ex. V–7, Cong.Rec. H4950.) On October 2, 2003, the House of Representatives passed the Conference Report for S. 3, the Partial–Birth Abortion Ban Act of 2003, by a vote of 281 to 142. (Ex. W, Cong.Rec.H9154–55.) The Senate passed the Conference Report for S. 3 on October 21, 2003, by a vote of 64 to 34. (Ex. W–1, Cong.Rec.S12948.) The legislation was then sent to the President, who signed the Act into law.

### 6. Views of Advocacy and Medical Associations

Throughout Congress's consideration of partial-birth abortion legislation, it heard the views of professional and medical-services organizations. The Court summarizes those views here, both as present in the congressional record and supplemented at trial in this case. Nine medical organizations opposed the ban, while two medical organizations supported it. One organization initially supported a ban on D & X, only to reconsider its position.

*(a) Associations Opposing the Act*

Opposing the ban were: (1) ACOG; (2) AMWA; (3) the American Public Health Association ("APHA"); (4) PRCH; (5) ANA; (6) NAF; (7) the California Medical Association ("CMA"); (8) the Maine Medical Association ("MMA"); and (9) the Association of Reproductive Health Professionals ("ARHP").

ACOG, a professional organization of board-certified obstetricians and gynecologists, opposed the ban. (Tr. 178:10–179:10 (Cain).) ACOG stated that although there may be alternatives to D & X to preserve maternal life or health, there may be times when D & X is the best or the most appropriate procedure. (149 Cong. Rec. S12921 (daily ed. Oct. 21, 2003) (state-

ment of ACOG).) ACOG further believed that only a physician, in consultation with a patient, should decide which abortion procedure a woman should undergo. (*Id.*) The ACOG policy statement was not voted upon by its members; rather, its Executive Board adopted the policy based on the conclusions of a panel that considered the matter.[11]

At trial in this matter, the Government contended that there was no forum in which ACOG's current policy on D & X was discussed or voted on by its entire membership. (Tr. 2229:3–16 (Cain).) According to the Government, the final policy statement did not become available to ACOG's membership until after it was already approved by the Executive Board, and the panel that submitted the proposed policy statement to the Executive Board was not involved in any discussions about the board's changes. (Tr. 2227:15–25, 2462:4–9 (Cain).) Therefore, the Government argues that it is questionable whether the ACOG policy statement accurately represents the views of its membership. The Executive Board reaffirmed its policy statement as recently as September 2000, and it remains the policy of ACOG. (Tr. 176:9–178:9, 187:2–190:2 (Cain).) [12]

AMWA, an organization of female physicians, residents, and medical students, also opposed the Act. (March 2003 Hearing at 201; 149 Cong. Rec. S11597 (daily ed. Sept. 17, 2003); Tr. 1243:18–25, 1263:8–1265:6 (Kissell).) AMWA opposed the Act because it believes the Act prohibits a procedure that in some circumstances may be the safest and the most appropriate means to preserve a woman's health. (March 2003 Hearing at 201; 149 Cong. Rec. S11597; Tr. 1256:2–7 (Kissell).) This position was expressed in a letter to Congressman Jerrold Nadler, the ranking member of the House Subcommittee on the Constitution. (March 2003 Hearing at 201; 149 Cong. Rec. S11597; Tr. 1254:12–16 (Kissell).) Meghan Kissell, AMWA's director for communications and advocacy, prepared the letter by relying upon a similar letter from AMWA to Congress regarding prior legislation. (Tr. 1254:12–1255:12, 1273:13–15 (Kissell).)

The Government contends that AMWA never issued a formal position statement on the Act or predecessor legislation, and that Kissell independently prepared AMWA's letters to Congress. (Tr. 1271:1–7, 1272:21–1273:2, 1275:20–1276:15 (Kissell).)

Like ACOG and AMWA, APHA also opposed the Act. APHA consists of members from public-health occupations, including obstetricians and gynecologists. (Tr. 1291:19–1294:12 (Baker).) APHA opposed the Act because it does not include a

---

**11.** ACOG has an Executive Board with approximately twenty elected members who oversee ACOG's activities and policies. (Tr. 179:11–180:25 (Cain).) In October 1996, the panel convened and submitted to the Executive Board a proposed policy statement which concluded that the panel could "identify no circumstances under which [D & X] would be the only option to save the life or preserve the health of the woman," but that "notwithstanding this conclusion, ACOG strongly believes that decisions about medical treatment must be made by the doctor in consultation with the patient" based upon the woman's particular circumstances. (Tr. 155:3–19, 157:22–158:4 (Cain).) The ACOG Executive

Board edited the proposed policy statement to add, "[a]n intact D & X, however, may be the best or most appropriate procedure in a particular circumstance to save a life or preserve the health of a woman ... and only the doctor in consultation with the patient based upon the woman's particular circumstances can make this decision." (Tr. 155:20–156:7 (Cain).)

**12.** Notably, the Supreme Court relied heavily on ACOG's policy statement in concluding that there existed "responsible differences of medical opinion" as to the safety advantages of D & X. *See Stenberg*, 530 U.S. at 937, 120 S.Ct. 2597.

health exception in circumstances in which a physician determines that D & X is the best or the most appropriate procedure to preserve the health of the woman. (149 Cong. Rec. S11596–97 (daily ed. Sept. 17, 2003); Tr. 1278:24–1279:15, 1297:5–11 (Baker).) APHA based its stance on its long-standing policy favoring a woman's right to reproductive choice. (140 Cong. Rec. S11596–97; Tr. 1279:18–1280:12 (Baker).) The organization expressed its position in a letter to Congress. (140 Cong. Rec. S11596–97.) Again, the Government argues that APHA did not consult its members while preparing the letter. (Tr. 1302:24–1303:2 (Baker).)

NAF presented testimony before Congress against the ban. Its executive director, Vicki Saporta, testified that D & X may be the most appropriate medical procedure for some women and that, even after viability, the procedure may be necessary to preserve maternal health. (March 1997 Hearing at 31–32.)

CMA submitted a letter to Congress to express its opposition to the ban. It contended that a ban on D & X would be deleterious to women's health. CMA cited specific reasons for this view, which included that D & X would "maintain[ ] uterine integrity, reduc[e] blood loss .... [and] permit[ ] the performance of a careful autopsy and therefore a more accurate diagnosis of ... fetal anomal[ies]." (142 Cong. Rec. S11351 (daily ed. Sept. 26, 1996).) For these reasons, CMA informed Congress that it believed D & X "may provide substantial medical benefits.... [and] is safer in several respects than the alternatives." (*Id.*)

Drs. Natalie Roche and Gerson Weiss co-authored a letter on behalf of PRCH, a professional organization of practicing obstetricians and gynecologists and academics. (149 Cong. Rec. S11597–98 (daily ed. Sept. 17, 2003).) Although the letter primarily opposed the Act on the ground that it failed to narrowly define partial-birth abortion so as to include only D & X, it also opposed the ban for lack of a health exception. (*Id.*) According to PRCH, banning the procedure would endanger the health of women. (*Id.* at 1597.)

ANA, a professional organization representing registered nurses, likewise opposed the ban. (November 1995 Hearing at 338; *see also* 149 Cong. Rec. H9150 (daily ed. Oct. 2, 2003) (statement of Rep. Stark).) It contended that D & X may be necessary when a fetus has severe abnormalities. (November 1995 Hearing at 338.)

MMA, a medical association whose membership includes both "pro-choice" and "pro-life" individuals and which does not endorse elective abortions during the third trimester of pregnancy, wrote Congress to oppose the Act. (145 Cong. Rec. S12897 (daily ed. Oct. 20, 1999).) MMA espoused the view that D & X "may be the most medically appropriate procedure for a woman in a particular case." (*Id.*) The organization expressed several reasons for its opinion; among them were that D & X maintains uterine integrity, reduces blood loss, and may be the only option when certain fetal anomalies are present. (*Id.*) MMA also opined that unlike any other surgical abortion procedures, D & X would permit an accurate autopsy and diagnosis of fetal anomalies, thereby providing a woman with genetic counseling to prepare for future pregnancies. (*Id.*)

ARHP wrote Congress to oppose the ban as well. (149 Cong. Rec. S12938 (daily ed. Oct. 20, 2003) (statement of ARHP).) The organization opposed the Act on several grounds, including that it lacked a maternal health exception. (*Id.*) Although it did not provide specifics to support its contention, ARHP concluded that the restriction on D & X would be harmful to maternal health. (*Id.*)

*(b) Associations Supporting the Act*

In contrast, the congressional record contains testimony of two associations that supported the ban: PHACT and the Association of American Physicians & Surgeons ("AAPS").

PHACT submitted a letter during the 107th Congress expressing its support for the ban. (July 2002 Hearing at 184–85 (letter dated Sept. 18, 1996); *id.* at 236–45 (letter dated Jan. 29, 1997).) PHACT is an organization of physicians, most of whom are obstetricians and gynecologists, that was formed specifically to address the debate surrounding partial-birth abortion. (*Id.* at 184, 236.) PHACT supported the Act on several grounds; of particular relevance here, the organization asserted that D & X is never medically indicated and itself poses health risks to women. (*Id.* at 184–85.) According to PHACT, D & X is never required even when maternal or fetal health conditions are present, such as hydrocephaly (excessive cerebrospinal fluid in the head) or polyhydramnios (an excess of amniotic fluid collecting in the woman). (*Id.* at 184.) PHACT also explained that its research on D & X led it to conclude that the procedure is never the safest or most appropriate option for women. (*Id.* at 237.) PHACT also countered ACOG's policy statement opposing the ban on the ground that, similar to the Government's position at trial, ACOG did not poll its membership before issuing its statement. (*Id.* at 238.) PHACT explained that its members never received notification that ACOG was reviewing the issue of partial-birth abortion or that ACOG intended to convene a panel to consider the topic. (*Id.*)

There is evidence in the congressional record that AAPS supported the ban. (H.R.Rep. No. 108–58, at 117–34 (2003) (amicus brief of AAPS).) AAPS submitted an amicus brief to the Supreme Court in which it argued that D & X is not an effective procedure and that it fails to offer safety advantages over other abortion techniques. (*Id.* at 125–28.) AAPS also argued that there exists no special health or medical indications that would necessitate D & X. (*Id.* at 128–29.) Although its amicus brief was included in the congressional record on the motion of Rep. Steve King, AAPS did not submit it to Congress, nor has AAPS expressed its view regarding the Act. (*Id.* at 115.)

*(c) The AMA*

The congressional record also contains conflicting position statements issued by the AMA. In May 1997, the AMA endorsed proposed legislation that would ban partial-birth abortion. (March 2003 Hearing at 247, 261.) Later, the AMA supported the legislation because it clearly defined the prohibited procedure, contained an adequate life exception, and allowed an accused physician to have his conduct reviewed before a preliminary medical board before criminal proceedings commenced. (July 2002 Hearing at 124, 186–87.) A 1997 Report of AMA's Board of Trustees suggested that D & X may minimize trauma to the uterus, cervix, and other maternal organs. (July 2002 Hearing at 189, 196–97.) The AMA withdrew its earlier support for a proposed ban on partial-birth abortion. (149 Cong. Rec. S3460 (daily ed. Mar. 11, 2003) (letter of AMA); July 2002 Hearing at 212.) The AMA did not support the ban because it would impose criminal penalties on physicians performing a partial-birth abortion; the AMA did not address the issue of whether the procedure was medically necessary. (149 Cong. Rec. S3460; July 2002 Hearing at 212.)

### D. *Stenberg v. Carhart*

As stated above, the Supreme Court passed on the constitutionality of Nebraska's partial-birth abortion statute in 2000. Because of its importance to the resolution

of this case, this Court describes in some detail the facts and majority, concurring, and dissenting opinions in *Stenberg.*

The plaintiff in the case was Dr. Leroy Carhart, an abortion-provider who had challenged a Nebraska statute which banned partial-birth abortion. After a trial, the district court held the statute unconstitutional.[13] *See Carhart v. Stenberg,* 11 F.Supp.2d 1099 (D.Neb.1998) (*"Carhart, D.Neb."*). The Eighth Circuit affirmed. *See Carhart v. Stenberg,* 192 F.3d 1142 (8th Cir.1999). In a 5–4 decision, the Supreme Court applied its earlier ruling in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion),[14] to hold that the statute was unconstitutional for two reasons: (1) it did not provide an exception when the procedure was necessary, in appropriate medical judgment, for the preservation of the health of the mother; and (2) it imposed an undue burden on a woman's ability to choose an abortion. *Stenberg,* 530 U.S. at 930, 120 S.Ct. 2597. Because this Court does not reach the undue burden question,[15] it will confine its summary of *Stenberg* to the issue of a health exception.

### 1. The Nebraska Statute

The Nebraska statute read as follows:

No partial birth abortion shall be performed in this state, unless such procedure is necessary to save the life of the mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself.

*Id.* at 921–22, 120 S.Ct. 2597 (quoting Neb. Rev.Stat. Ann. § 28–328(1)). The statute defined "partial birth abortion" as "an abortion procedure in which the person performing the abortion partially delivers vaginally a living unborn child before killing the unborn child and completing the delivery." *Id.* at 922, 120 S.Ct. 2597 (quoting Neb.Rev.Stat. Ann. § 28–326(9)) (internal quotation marks omitted). "Partially delivers vaginally a living unborn child before killing the unborn child" was defined in the statute as "deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child." *Id.* (quoting Neb.Rev.Stat. Ann. § 28–326(9)) (internal quotation marks omitted). The penalty section of the statute classified the prohibited conduct as a felony carrying a prison term of not more than twenty years, a fine of up to $25,000, and automatic revocation of a physician's license to practice medicine in the state. *Id.* (citing Neb.Rev.Stat. Ann. §§ 28–328(2), 28–105, 28–328(4)).

### 2. The Majority Opinion

#### (a) The Facts Before the Court

The majority set forth "[t]he evidence before the trial court, as supported and supplemented in the literature." *Id.* at 923, 120 S.Ct. 2597. According to the Court, ninety percent of all abortions in this country occur during the first trimester, that is, before twelve weeks' gestation-

---

**13.** The Government represented at trial in this matter that the trial in *Stenberg* lasted only one day. (Tr. at 2895 (Government's closing argument).)

**14.** Although no opinion in *Casey* garnered five votes, the joint opinion of Justices O'Connor, Kennedy, and Souter is accepted to be binding precedent. *See, e.g., Stenberg,* 530 U.S. at

952, 120 S.Ct. 2597 (Rehnquist, C.J., dissenting) (noting that *Casey*'s joint opinion was the holding for the Court under the rule of *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)).

**15.** See *infra* section III.A for an explanation as to why the Court does not reach Plaintiffs' undue burden challenge.

al age. *Id.* (citing Centers for Disease Control and Prevention, Abortion Surveillance—United States, 1996, at 41 (July 30, 1999) [hereinafter Abortion Surveillance] ). The most used abortion method during the first trimester is vacuum aspiration, performed under local anesthesia on an outpatient basis. *Id.* (citing *Carhart, D. Neb.,* 11 F.Supp.2d at 1102, and *Obstetrics: Normal & Problem Pregnancies* 1253–54 (S. Gabbe, J. Niebyl, & J. Simpson eds.3d ed.1996)). Approximately ten percent of abortions are performed during the second trimester. *Id.* at 924, 120 S.Ct. 2597 (citing Abortion Surveillance at 41.) While in the past, physicians tended to inject saline into the uterus to induce labor as the primary second-trimester abortion procedure, *id.* at 924, 120 S.Ct. 2597 (citing Abortion Surveillance at 8, and *Planned Parenthood of Cent. Mo. v. Danforth,* 428 U.S. 52, 76, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976)), D & E has replaced induction as the most common method of abortion during the second trimester. *Id.*

The Court looked to the "American Medical Association, Report of Board of Trustees on Late–Term Abortion" ("AMA Report"), which was part of the district court record, to define the D & E procedure. *See id.* at 924–25, 120 S.Ct. 2597. The Court also quoted from Dr. Carhart's trial testimony about the dismemberment method of D & E, and summarized the risks that accompany it: "The use of instruments within the uterus creates a danger of accidental perforation and damage to neighboring organs. Sharp fetal bone fragments create similar dangers. And fetal tissue accidentally left behind can cause infection and various other complications." *Id.* at 926, 120 S.Ct. 2597 (citing *Carhart, D. Neb.,* 11 F.Supp.2d at 1110, *Gynecologic, Obstetric, and Related Surgery* 1045 (D. Nicholas & D. Clarke–Pearson eds.2d ed.2000), and F. Cunningham, et al., *Williams Obstetrics* 598 (20th ed.1997)). The Court noted that "the risks

of mortality and complication that accompany the D & E procedure between the 12th and 20th weeks of gestation are significantly lower than those accompanying induced labor procedures." *Id.* (citing AMA Report and various medical texts). The majority examined different sources for the definition of D & X, including the trial testimony of Drs. Carhart and Phillip Stubblefield, a number of obstetric and abortion clinical textbooks, and ACOG's Executive Board's 1997 Policy Statement on Intact Dilation and Extraction. *See id.* at 928, 120 S.Ct. 2597.

Based on the record before it, the district court had concluded that "the evidence is both clear and convincing that Carhart's D & X procedure is superior to, and safer than, the ... other abortion procedures used during the relevant gestational period in the 10 to 20 cases a year that present to Dr. Carhart." *Id.* at 928–29, 120 S.Ct. 2597 (quoting 11 F.Supp.2d at 1126) (internal quotation marks omitted). The Supreme Court took from the district court record examples of when D & X would be the most beneficial procedure: when a fetus has hydrocephalus; when the woman has prior uterine scars; and when induction would be dangerous to the mother. *See id.* at 929, 120 S.Ct. 2597.

### (b) The Court's Legal Analysis

The majority's point of departure were the principles established in *Casey.* First, before fetal viability, "the woman has a right to choose to terminate her pregnancy." *Casey,* 505 U.S. at 870, 112 S.Ct. 2791. Second, a law enacted to further a State's interest in fetal life is unconstitutional if it "imposes an undue burden on the woman's decision before fetal viability." *Id.* at 877, 112 S.Ct. 2791. Third, "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and

even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life and health of the mother." *Id.* at 879, 112 S.Ct. 2791 (quoting *Roe v. Wade,* 410 U.S. 113, 164–65, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)). It is the third of these principles that guided the *Stenberg* Court in striking down the Nebraska statute. According to the Court, because "a State may promote but not endanger a woman's health when it regulates the methods of abortion," any statute that regulates abortion must contain an exception when appropriate medical judgment believes it necessary to protect the mother's life or health. *Stenberg,* 530 U.S. at 931, 120 S.Ct. 2597.

The Court also rejected the argument that the state interests meant to be furthered by the statute eliminated the need for a health exception. *See id.* at 930–31, 120 S.Ct. 2597. Those interests were: to show concern for the life of the unborn, to prevent cruelty to partially born children, and to preserve the integrity of the medical profession. *Id.* The fact that these interests were different than the state interest in the potentiality of human life, which the plurality opinion in *Casey* held required a health exception even for post-viability abortions, *see Casey,* 505 U.S. at 879, 112 S.Ct. 2791, did not alter the Court's analysis. In the Court words, "[W]e cannot see how the interest related differences could make any difference to the question at hand, namely the application of the 'health' requirement." *Stenberg,* 530 U.S. at 931, 120 S.Ct. 2597.

According to the majority, the district court record demonstrated that "significant medical authority supports the proposition that in some circumstances, D & X would be the safest procedure." *Id.* at 932, 120 S.Ct. 2597. The district court had found that D & X decreases the amount of necessary instrumentation, which:

reduces operating time, blood loss and risk of infection; reduces complications from bony fragments; reduces instrument-inflicted damage to the uterus and cervix; prevents the most common causes of maternal mortality (D[isseminated intravascular coagulopathy] and amniotic fluid embolus); and eliminates the possibility of 'horrible complications' arising from retained fetal parts.

*Id.* (quoting *Carhart, D. Neb.,* 11 F.Supp.2d at 1126). In objecting to the district court's findings, Nebraska offered eight arguments: (1) D & X is an uncommon procedure; (2) few physicians perform the procedure; (3) D & E and labor induction are safe alternative procedures; (4) a ban on D & X would not increase the risk of rare abortion complications such as disseminated intravascular and amniotic fluid embolus; (5) D & X may create the risk of: cervical incompetence due to increased dilation of the cervix, injuries caused by conversion of the fetal presentation, and dangers from the use of instrumentation to pierce the fetal skull while in the birth canal; (6) no medical studies show that D & X is generally safe or that it is safer than other abortion procedures; (7) the AMA stated that there is no identified situation in which D & X is the best or most appropriate abortion procedure; and (8) ACOG stated that it could not identify any circumstances when D & X would be the only option to save the life or preserve the health of the woman. *See id.* at 933–34, 120 S.Ct. 2597. The Supreme Court held that these arguments did not belie the need for a health exception.

The Court determined that the frequency of the procedure's use and the number of doctors who used it had little relevance. *See id.* at 934, 120 S.Ct. 2597. In the Court's view, "the State cannot prohibit a person from obtaining treatment simply by pointing out that most people do not need it." *Id.* And, the lack of widespread use of

the procedure might reflect the "comparative rarity of late second term abortions, the procedure's recent development ..., the controversy surrounding it, or ... the procedure's lack of utility." *Id.*

The Supreme Court also concluded that, in both the district court record and amici submissions, there was evidence contradicting Nebraska's medically based arguments. *See id.* ("[T]he record responds to Nebraska's (and *amici*'s) medically based arguments.") The district court had found that D & X was safer in certain circumstances while Nebraska and some amici disagreed; the district court relied on evidence presented to it and to Congress that D & X reduces the risk of abortion complications while Nebraska and some amici argued the opposite; and some experts, including ACOG in its amicus brief to the Supreme Court, believed that alternative procedures presented as much if not more of the risks that Nebraska and amici in its favor said D & X created. *See id.* at 934–35, 120 S.Ct. 2597. In addition, the Court agreed that there were no general medical studies documenting D & X's comparative safety and that the AMA had suggested that D & X should not be used unless alternative procedures would pose greater risks to the woman. *See id.* at 935, 120 S.Ct. 2597 (citing Late Term Pregnancy Termination Techniques, AMA Policy H–5.982). In response to Nebraska's final argument regarding ACOG's inability to identify a circumstance in which D & X would be the only option to preserve the life or health of the mother, the Court asserted that ACOG had identified health-related needs for D & X. *See id.* at 936, 120 S.Ct. 2597 (quoting Brief for ACOG et al. as amicus curiae at 21–22).

Thus, the Supreme Court found Nebraska's arguments "insufficient to demonstrate that Nebraska's law needs no health exception." *Id.* at 934, 120 S.Ct. 2597. The Court based its conclusion on a conflu-

ence of evidentiary circumstances: (1) the district court's finding that D & X obviates health risks in some situations, (2) plausible record-based support for that finding, (3) "a division of opinion among some medical experts over whether D & X is generally safer," and (4) "an absence of controlled medical studies that would help answer these medical questions." *Id.* at 936–37, 120 S.Ct. 2597. The majority found the lack of consensus among members of the medical community highly significant.

The Court noted that "necessary" in the phrase "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother" does not mean absolutely necessary or require absolute proof of the procedure's necessity because "[m]edical treatments and procedures are often considered appropriate (or inappropriate) in light of estimated comparative health risks (and health benefits) in particular cases." *Id.* at 937, 120 S.Ct. 2597. "Appropriate medical judgment" does not mean that the medical community must be unanimous in its view that the procedure is necessary, but that phrase "must embody the judicial need to tolerate responsible differences of medical opinion." *Id.* As an example of that disagreement, the Court cited the different positions on D & X taken by the AMA and ACOG. *See id.*

The Supreme Court emphasized that the disagreement among qualified experts about the safety and advantages of D & X favored the requirement of a health exception:

> Where a significant body of medical opinion believes that a procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view, we cannot say that the presence of a different view by itself proves the contrary. Rather, the uncertainty means a significant likeli-

hood that those who believe that D & X is a safer abortion method in certain circumstances may turn out to be right. If so, then the absence of a health exception will place women at an unnecessary risk of tragic health consequences. If they are wrong, the exception will simply turn out to have been unnecessary. *Id.* Given this disagreement among experts, the Court held that an exception to protect the health of the mother was constitutionally mandated because "a State may promote but not endanger a woman's health when it regulates the methods of abortion." *Id.* at 931, 120 S.Ct. 2597.

### 3. The Concurring Opinions

Justice O'Connor joined the majority opinion, but wrote separately to emphasize that a health exception was required in both pre- and postviability abortion bans.[16] *See id.* at 948, 120 S.Ct. 2597 (O'Connor, J., concurring). Justice O'Connor explained that when a significant body of medical opinion believes a procedure may bring greater safety for some patients, and explains the reasons for the view, a state cannot say that the procedure will never be necessary to preserve a woman's health, and thus cannot ban the procedure under *Casey* without a health exception. *See id.*

Justices Stevens and Ginsburg also wrote separate concurrences, both focusing on what they believed to be the irrationality of the statute. *See* 530 U.S. at 946–47, 120 S.Ct. 2597 (Stevens, J., concurring); 530 U.S. at 951–52, 120 S.Ct. 2597 (Ginsburg, J., concurring).

### 4. The Dissenting Opinions

Chief Justice Rehnquist and Justices Scalia, Kennedy, and Thomas dissented.

The Chief Justice wrote a brief paragraph, while Justices Kennedy, Thomas, and Scalia wrote at length. All of the dissenting opinions read the majority decision to create an evidentiary standard that would be extremely difficult for a state to overcome.

Justice Kennedy did not agree that *Casey* dictated the result that the majority had reached. *See* 530 U.S. at 961, 120 S.Ct. 2597 (Kennedy, J., dissenting). In Justice Kennedy's view, the health-exception standard that the Court articulated "awards each physician a veto power over the State's judgment that the procedures should not be performed." *Id.* at 964, 120 S.Ct. 2597. Justice Kennedy also criticized the majority for transforming *Casey*'s holding that a health exception is mandated only when the medical procedure *is* necessary, into a requirement that the procedure cannot be banned when it *may be* necessary. *See id.* at 966, 120 S.Ct. 2597. "[T]he Court is wrong," Justice Kennedy wrote, "to limit its inquiry to the relative physical safety of the two procedures, with the slightest potential difference requiring the invalidation of the law." *Id.* at 967, 120 S.Ct. 2597.

Justice Kennedy further asserted that the majority's standard does not allow states to ban procedures in the absence of a medical consensus about the procedure's safety benefits. He contrasted the majority's holding with cases such as *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), a point the majority did not address. In *Hendricks,* the Court "held that disagreements among medical professionals 'do not tie the State's hands in setting the bounds of . . . laws. In fact, it is precisely where such disagree-

---

**16.** Justice O'Connor also cited state partial-birth abortion bans that, in her view, did not impose an undue burden on a woman's right to choose a previability abortion. *See* 530 U.S. at 950, 120 S.Ct. 2597 (O'Connor, J., concurring). She suggested that a partial-birth abortion ban that included a health exception and was modeled on these states' laws would be constitutional. *See id.*

ment exists that legislatures have been afforded the widest latitude.'" *Stenberg*, 530 U.S. at 970, 120 S.Ct. 2597 (Kennedy, J., dissenting) (quoting *Hendricks*, 521 U.S. at 360 n. 3, 117 S.Ct. 2072). Thus, in Justice Kennedy's view, a standard that requires any ban on an abortion method to permit the procedure when "appropriate medical judgment" believes it may carry some health benefits means there can be no partial-birth abortion bans at all. *See id.* at 972, 120 S.Ct. 2597.

Justice Thomas's dissent also argued that the majority misapplied *Casey*. *See* 530 U.S. at 983, 120 S.Ct. 2597 (Thomas, J., dissenting) ("If this statute is unconstitutional under *Casey*, then *Casey* meant nothing at all ...."); *see also id.* at 1005, 120 S.Ct. 2597 ("Although the majority and Justice O'CONNOR purport to rely on the standard articulated in the *Casey* joint opinion in concluding that a State may not [prohibit partial-birth abortion without a health exception], they in fact disregard it entirely.") Justice Thomas interpreted the majority's standard to mean, "[U]nless a State can conclusively establish that an abortion procedure is no safer than other procedures, the State cannot regulate that procedure without including a health exception." *Id.* at 1009, 120 S.Ct. 2597. Justice Thomas, like the other dissenters who wrote separately, suggested that the majority's holding would require all regulations of abortion methods to contain a health exception. As Justice Thomas put it, "The exception entirely swallows the rule. In effect, no regulation of abortion procedures is permitted because there will always be *some* doctors who conclude that the procedure is preferable." *Id.*

Justice Scalia, unlike Justices Kennedy and Thomas, agreed with the majority that its decision logically flowed from the *Casey* opinion. *See* 530 U.S. at 955–56, 120 S.Ct. 2597 (Scalia, J., dissenting). However, he asserted that *Casey* should be overruled.

*See id.* at 956, 120 S.Ct. 2597. Justice Scalia, like Justice Kennedy, criticized the majority's standard as one too easily satisfied by abortion-providers and nearly impossible to overcome by states seeking to ban the procedure:

> [T]he Court must know (as most state legislatures banning this procedure have concluded) that demanding a "health exception"—which requires the abortionist to assure himself that, in his expert medical judgment, this method is, in the case at hand, marginally safer than others (how can one prove the contrary beyond a reasonable doubt?)—is to give live-birth abortion free rein.

*Id.* at 953, 120 S.Ct. 2597.

### E. Trial Experts

#### 1. Plaintiffs' Experts

Plaintiffs offered the testimony of sixteen witnesses at trial. The Court recognized seven of Plaintiffs' witnesses as experts in obstetrics and gynecology and abortion practice and/or procedures. The Court briefly discusses the general background and qualifications of each of these experts.

Amos Grunebaum, M.D., a licensed physician and board-certified obstetrician and gynecologist and maternal-fetal medicine specialist, is the Director of Clinical and Maternal–Fetal Medicine at New York Presbyterian Hospital and an Assistant Professor of Obstetrics and Gynecology at Weil Medical College of Cornell University. (Tr. 203:15–205:4, 206:23–207:11 (Grunebaum); Ex. 94, Curriculum Vitae of Amos Grunebaum, M.D. [Grunebaum C.V.].) Dr. Grunebaurn has performed approximately 1000 abortions in the first and second trimesters; he has performed approximately 100 abortions using D & E as well as fifteen to twenty that involved intact removal of the fetus, or D & X. (Tr. 210:8–213:12, 307:17–308:4, 312:1–7 (Gru-

nebaum).) Dr. Grunebaum teaches various abortion procedures, including D & E and D & X, to medical students and residents at Cornell. (Tr. 210:8–213:12, 307:17–308:4, 312:1–7 (Grunebaum).) He has also authored more than forty-five peer-reviewed scientific articles, abstracts, and book chapters concentrated on obstetrics, gynecology, and women's healthcare. (Tr. 216:4–217:2 (Grunebaum).)

Timothy R.B. Johnson, M.D., a licensed physician and board-certified obstetrician and gynecologist and maternal-fetal medicine specialist, is the Chair of the Department of Obstetrics and Gynecology at the University of Michigan Medical School. (Tr. 388:13–390:9, 394:24–395:4 (Johnson); Ex. 106, Curriculum Vitae of Timothy Robert Bradley Johnson, M.D. [Johnson C.V.].) Dr. Johnson has performed medical and surgical abortions in the first and second trimesters; he has performed induction and D & Es, and has observed the D & X procedure being performed. (Tr. 396:4–400:11 (Johnson).) Dr. Johnson teaches maternal-fetal medicine and reproductive health, and oversees several educational, residency, and subspecialty training programs in obstetrics and gynecology, reproductive endocrinology, maternal-fetal medicine, and urogynecology. (Tr. 402:3–405:2 (Johnson).) He has authored approximately 100 peer-reviewed publications and several books and book chapters in the areas of obstetrics and gynecology. He previously testified as the court-appointed expert in the case *Evans v. Kelley*, a challenge to Michigan's partial-birth abortion ban. (Tr. 390:10–391:22 (Johnson); *Evans v. Kelley*, 977 F.Supp. 1283, 1288–89 (E.D.Mich.1997).) Dr. Johnson is also a plaintiff in this case. (Tr. 390:10–11 (Johnson).)

Cassing Hammond, M.D., a licensed physician and board-certified obstetrician and gynecologist, is an Assistant Professor in Obstetrics and Gynecology at the Northwestern University School of Medicine, the Director of the Northwestern Program in Family Planning, and the Medical Director at Prentice Ambulatory Care. (Tr. 517:12–522:2 (Hammond); Ex. 98, Curriculum Vitae of Cassing Hammond, M.D. [Hammond C.V.].) Dr. Hammond has performed thousands of previability abortions, including D & E and D & X. (Tr. 526:1–530:8, 533:9–20 (Hammond).) He teaches various abortion procedures, including D & E and D & X, to residents and medical students at Northwestern. (Tr. 534:2–535:20 (Hammond).) Dr. Hammond previously testified in two cases that challenged partial-birth abortion bans. (Tr. 538:3–8, 539:21–540:10 (Hammond); *Women's Med. Prof'l Corp. v. Taft*, 162 F.Supp.2d 929, 932 (S.D.Ohio 2001), *rev'd*, 353 F.3d 436 (6th Cir.2003); *Hope Clinic v. Ryan*, 995 F.Supp. 847, 849, 850–51 (N.D.Ill.1998).) He is also a plaintiff in this case. (Tr. 522:3–5 (Hammond).)

Dr. Carolyn Westhoff, M.D., a licensed physician and board-certified obstetrician and gynecologist, is the Medical Director of Special GYN Services, Medical Director of the Family Planning Clinic, an attending physician at New York Presbyterian–Columbia Presbyterian Medical Center, and Professor of Epidemiology and of Population and Family Health in the School of Public Health at Columbia University. (Tr. 731:2–10, 732:14–23, 765:6–16 (Westhoff); Ex. 126, Curriculum Vitae of Carolyn L. Westhoff, M.D. [Westhoff C.V.].) She has performed hundreds of previability abortions, including D & E and D & X procedures. (Tr. 743:9–744:4, 745:12–746:11, 747:18–751:4 (Westhoff).) In 2003, she performed or supervised fifty D & E and D & X abortions. (Tr. 742:5–751:4 (Westhoff).) Dr. Westhoff teaches abortion procedures, including D & E and D & X, to medical students and residents at Columbia. (Tr. 752:20–753:25 (Westhoff).) She has authored several book chapters and more than sixty peer-reviewed arti-

cles, in addition to serving as a peer-reviewer for journals such as the *New England Journal of Medicine* and the *Journal of the American Medical Association.* (Tr. 760:22–762:6 (Westhoff).) Dr. Westhoff has provided expert testimony in two cases that challenged partial-birth abortion bans. (Tr. 764:5–14 (Westhoff); *Evans,* 977 F.Supp. at 1287; *Planned Parenthood v. Verniero,* 22 F.Supp.2d 331, 333, 339 (D.N.J.1998).) She is also a plaintiff in this case. (Tr. 737:9–10 (Westhoff).)

Marilynn C. Frederiksen, M.D., a licensed physician and board-certified obstetrician, gynecologist, maternal-fetal medicine specialist, and clinical pharmacologist, is a tenured Associate Professor in Clinical Obstetrics and Gynecology at Northwestern University Medical School in Chicago. (Tr. 1038:23–1039:4, 1041:20–1042:15 (Frederiksen); Ex. 92, Curriculum Vitae of Marilynn Conners Frederiksen, M.D. [Frederiksen C.V.].) She practices privately at Northwestern Perinatal Associates, where she performs 100 to 125 previability abortions each year. (Tr. 1043:5–1046:24; Frederiksen C.V.) Throughout her career, Dr. Frederiksen has performed thousands of abortions at various gestational ages up to the point of viability. (Tr. 1043:5–1046:2 (Frederiksen).) She teaches Northwestern medical students and residents various abortion procedures, including D & E and D & X. (Tr. 1046:3–11 (Frederiksen).) Dr. Frederiksen has authored approximately fifty articles on general obstetrical and gynecological topics, including abortion. (Tr. 1046:25–1047:8; Frederiksen C.V.) She previously testified as an expert in high-risk care and abortion practice, but not in cases challenging partial-birth abortion bans. (Tr. 1049:15–24, 1050:9–1051:3 (Frederiksen).) She is active in the pro-choice movement; for example, Dr. Frederiksen currently serves on the board of directors of PRCH and recently spoke at an American Civil Liberties Union luncheon that addressed the Act's constitutionality. (Tr. 1166:21–1167:24 (Frederiksen).)

Gerson Weiss, M.D., a licensed physician who is board-certified in obstetrics and gynecology and reproductive endocrinology and fertility, is Professor and Chair of the Department of Obstetrics and Gynecology and Women's Health at the UMDNJ–New Jersey Medical School; he is also Chief of Service of Obstetrics and Gynecology at the UMDNJ–University Hospital in Newark. (Tr. 1305:19–1306:12 (Weiss); Ex. 124, Curriculum Vitae of Gerson Weiss, M.D.) During his career, Dr. Weiss has performed approximately 1,500 to 2,000 abortions, among them 300 to 500 D & E and D & X abortions. (Tr. 1311:1–1316:25, 1338:12–1340:11, 1341:7–21 (Weiss).) He has authored more than 250 publications, most of which were peer-reviewed. (Tr. 1318:8–13 (Weiss).) Dr. Weiss has previously testified as an expert in a case that challenged New Jersey's partial-birth abortion ban. (Tr. 1320:1–8 (Weiss); *Verniero,* 41 F.Supp.2d at 482–83.) He is a plaintiff in this case. (Tr. 1307:25–1308:1 (Weiss).)

Stephen Chasen, M.D., a licensed physician and board-certified obstetrician and gynecologist and maternal-fetal medicine specialist, is an Associate Professor of Obstetrics and Gynecology at the Weill Medical College of Cornell University and Director of High–Risk Obstetrics, Co–Director of the Obstetrics and Gynecology Residency, and Associate Director of the Maternal–Fetal Medicine Fellowship at New York Presbyterian–New York Weill Cornell Medical Center. (Tr. 1540:20–1541:10, 1547:10–23; Ex. 84, Curriculum Vitae of Stephen T. Chasen, M.D. [Chasen C.V.].) During his career, Dr. Chasen has performed approximately 500 previability abortions, approximately 200 D & Es and 75 D & X abortions. (Tr. 1551:12–1555:12 (Chasen).) He teaches various abortion procedures, including D

& E and D & X, to fellow professors and residents at Cornell's Weill Medical College. (Tr. 1555:14–1557:4 (Chasen).) Dr. Chasen has authored about twenty-five peer-reviewed articles on topics such as abortion practice and maternal-fetal medicine. (Tr. 1557:10–1558:20; Chasen C.V.) Dr. Chasen coauthored the only peer-reviewed study to compare the safety of D & E and D & X abortions, which was recently published in the *American Journal of Obstetrics & Gynecology*. (Tr. 1612:22–1614:10 (Chasen); Ex. 23A, Stephen T. Chasen et al., *Dilation and Evacuation at ≥ 20 Weeks: Comparison of Operative Techniques*, Am. J. of Obstetrics & Gynecology [hereinafter, Chasen Study] (proof of forthcoming article).) He is also a plaintiff in this case. (Tr. 1540:18–19 (Chasen).)

In addition, Plaintiffs introduced the testimony of six witnesses via deposition. Mitchell D. Creinin, M.D., a licensed physician and board-certified obstetrician and gynecologist, is a Professor in the Department of Obstetrics, Gynecology, and Reproductive Sciences, and the Fellowship Director of the Family Planning Program at the University of Pittsburgh School of Medicine, as well as an Associate Professor in the Department of Epidemiology at the University of Pittsburgh Graduate School of Public Health. (Ex. 87, Curriculum Vitae of Mitchell D. Creinin, M.D. [Creinin C.V.].) Dr. Creinin annually performs approximately 500 previability abortions, including about 100 to 150 abortions between fifteen and twenty-four weeks' gestation. (Tr. 1469:19–1471:14 (Creinin).) Dr. Creinin has authored more than eighty peer-reviewed articles. (Creinin C.V.)

Maureen Paul, M.D., M.P.H., a licensed physician who is board-certified in obstetrics and gynecology and occupational and environmental medicine, also testified via portions of a deposition. (Tr. 1435:17–19 (Paul); Ex. 116, Curriculum Vitae of Maureen E. Paul, M.D., M.P.H. [Paul C.V.].) An Associate Clinical Professor in the Department of Obstetrics, Gynecology, and Reproductive Sciences at the University of California at San Francisco ("UCSF") School of Medicine, Director of Training for the Early Abortion Training Project at UCSF, and the Chief Medical Officer for Planned Parenthood Golden Gate, Dr. Paul teaches abortion methods to residents throughout Northern California. (Tr. 1434:16–1435:15 (Paul); Paul C.V.) She has performed approximately 2000 D & E and D & X abortions during her career. (Tr. 1439:7–13 (Paul).) Dr. Paul has edited a textbook on abortion and has authored numerous peer-reviewed articles, book chapters, and other publications. (Paul C.V.)

Plaintiffs also introduced portions of the deposition testimony of Watson A. Bowes, Jr., M.D., a Professor Emeritus at the University of North Carolina at Chapel Hill School of Medicine. (Tr. 2694:24–2695:1 (Bowes).) As a Professor Emeritus, he serves on the Institutional Review Board that reviews research projects, attends weekly teaching conferences, and gives lectures at symposia and seminars. (Tr. 2694:24–2696:2 (Bowes).) Dr. Bowes was originally designated as a witness for the Government.

Plaintiffs also introduced the deposition testimony of the Federal Rule of Civil Procedure 30(b)(6) [17] designees of various medical associations.[18] Joanna M. Cain,

---

**17.** Rule 30(b)(6) provides that a party may name in a subpoena a corporation, association, or other organization as deponent, and that organization has the obligation to designate a knowledgeable individual to testify on the organization's behalf. *See* Fed.R.Civ.P. 30(b)(6).

**18.** Plaintiffs attempted to procure the attendance at trial of representatives of ACOG, AMWA, and APHA. However, each refused to

M.D., testified via deposition on behalf of ACOG. (Tr. 124:14–125:3 (Cain).) In addition, Meghan Kissel of AMWA and Alan Baker of APHA testified via deposition as the Rule 30(b)(6) designees of their respective associations. (Tr. 1242:2–1243:16 (Kissell); Tr. 1277:22–1278:17 (Baker).)

Plaintiffs also introduced in their case-in-chief the expert testimony of Dr. Sherwin Nuland, M.D., on the evolution of surgical procedures, and of Dr. Rebecca Baergen, M.D., a pathologist who offered testimony regarding testing for fetal abnormalities following abortion procedures. (Tr. 68:21–69:14 (Nuland); Tr. 1096:23–1098:11 (Baergen).) Dr. Joel D. Howell, M.D., Ph.D., a licensed physician who is board-certified in internal medicine, testified as a rebuttal expert in quantitative and qualitative analysis and evaluation of medical research. (Tr. 2666:3–9, 2673:13–25 (Howell).)[19]

### 2. Government's Experts

The Government offered the testimony of five witnesses at trial. The Court recognized four of the Government's witnesses as experts in obstetrics and gynecology and abortion practice and/or procedure and the fifth as an expert in the fields of neonatology, fetal pain, and pharmacology of anesthetic drugs. The Court briefly discusses the background and qualifications of each of these experts.

Charles Lockwood, M.D., a licensed physician and board-certified obstetrician and gynecologist and maternal-fetal medicine specialist, is the Chair of the Department of Obstetrics, Gynecology, and Reproductive Services at Yale University School of Medicine. (Tr. 1706:9–1707:14, 1708:15–19 (Lockwood); Ex. Z6, Curriculum Vitae of Charles J. Lockwood, M.D. [Lockwood C.V.].) Dr. Lockwood has performed other abortion procedures, but has only observed the D & E procedure. (Tr. 1718:24–1721:6 (Lockwood).) He has authored approximately 150 peer-reviewed scientific articles, as well as abstracts and book chapters. (Tr. 1711:16–1712:10 (Lockwood); Lockwood C.V.) Several of Dr. Lockwood's writings addressed the subject of abortion and the safety of D & E abortions. (Tr. 1721:7–22 (Lockwood).) He has also served as a peer-reviewer for numerous journals, such as the *New England Journal of Medicine* and the *Journal of the American Medical Association*. (Tr. 1712:25–1713:5 (Lockwood); Lockwood C.V.)

M. Leroy Sprang, M.D., a licensed physician and board-certified obstetrician and gynecologist, is an Associate Clinical Professor at Northwestern University, the Senior Attending Physician in the Department of Obstetrics and Gynecology at Evanston Northwestern University Healthcare, and a Consulting Physician in the Department of Obstetrics and Gynecology at St. Francis Hospital, Evanston, Illinois. (Tr. 2066:4–2068:21, 2091:2–5 (Sprang), Ex. Z–3, Curriculum Vitae of M. LeRoy Sprang, M.D. [Sprang C.V.].) Dr. Sprang has performed first and second-trimester abortions, all but one of which involved fetuses that were dead before the procedure commenced. (Tr. 2092:16–2094:10 (Sprang).) He has performed at least twenty D & Es and twenty induction abortions, but has never performed a D & X abortion. (Tr. 2095:24–2096:16, 2099:23–25, 2101:8–10 (Sprang).) He has authored approximately forty peer and non-peer reviewed scientific articles, including on late-

---

send representatives to testify. Thereafter, the Court requested that each of the organizations appear through representatives at trial. The Court was informed that each declined.

**19.** Additionally, the Court requested that Plaintiffs attempt to procure the attendance of Dr. Carhart as a witness at trial in this case. Plaintiffs informed the Court that Dr. Carhart declined to testify.

term abortion procedures, and a book chapter on obstetric and gynecologic infections. (Tr. 2068:22–2072:24 (Sprang); Sprang C.V.) Dr. Sprang also serves as a peer-reviewer for scientific journals such as the *American Journal of Obstetrics and Gynecology.* (Tr. 2089:17–22 (Sprang).) He previously testified as an expert in a case involving Ohio's partial-birth abortion ban. (Tr. 2073:8–16; *Women's Med. Prof'l Corp.,* 162 F.Supp.2d at 932.)

Dr. Steven Leigh Clark, M.D., a licensed physician and board-certified obstetrician and gynecologist and maternal fetal medicine specialist, is a Professor of Obstetrics and Gynecology at the University of Utah School of Medicine and the Director of Obstetric Education and Research at the LDS Hospital in Salt Lake City, Utah. (Tr. 2271:8–23, 2272:25–2273:8, 2277:25–2278:23 (Clark).) Dr. Clark has performed approximately twenty induction abortions and twelve D & E abortions during his career. (Tr. 2299:4–21, 2398:5–17 (Clark).) He has never performed a D & X abortion nor observed one performed, although he is familiar with the procedure through scientific writings. (Tr. 2307:11–2310:9, 2399:2–8 (Clark).) He has also authored more than 170 peer-reviewed scientific articles, book chapters, and books. (Tr. 2273:21–23, 2275:2–13, 2281:1–25, 2286:4–14 (Clark); Ex. Z–4, Curriculum Vitae of Steven Leigh Clark, M.D. [Clark C.V.].) In addition, Dr. Clark has served as an editorial consultant for peer-reviewed journals, including the *American Journal of Obstetrics and Gynecology,* which placed Dr. Clark in the top ten percent of its peer reviewers for the scientific quality of his manuscript reviews. (Tr. 2282:1–2283:12 (Clark); Clark C.V.) He also served as an editor for *Williams Obstetrics,* and for a textbook on critical care obstetrics. (Tr. 2286:8–12, 2273:21–23, 2275:2–14 (Clark).) Dr. Clark participated on a National Institute of Health panel that developed recommendations for managing asthma in pregnancy. (Tr. 2335:9–2335:15 (Clark).) For each year since 1992, he has been named by his peers to the list of "Best Doctors in America." (Clark C.V.)

Curtis R. Cook, M.D., a licensed physician and a board-certified obstetrician and gynecologist and maternal-fetal medicine specialist, is an Associate Clinical Professor in the Department of Obstetrics and Gynecology at the Michigan State University College of Human Medicine. (Tr. 2479:8–2480:6 (Cook); Ex. Z–1, Curriculum Vitae of Curtis R. Cook, M.D. [Cook C.V.].) Dr. Cook has performed first and second-trimester abortions, including inductions and D & Es. (Tr. 2486:11–14, 2487:21–2488:15, 2489:2–2490:1 (Cook).) He has performed three to five D & E abortions on dead fetuses, and has also supervised or assisted in ten to twenty D & Es. (Tr. 2490:17–23 (Cook).) Dr. Cook has never performed a D & X procedure, but has observed a videotape of one being performed and is familiar with the procedure through medical literature and medical histories of women who underwent the procedure. (Tr. 2496:15–24, 2501:8–9 (Cook).) Dr. Cook has authored approximately fifteen peer and non-peer reviewed scientific articles. (Cook C.V.) He previously testified as an expert in other cases involving partial-birth abortion bans, including challenges to partial-birth abortion bans in Missouri and Michigan. (Tr. 2563:5–17 (Cook); *see, e.g., Evans,* 977 F.Supp. at 1288, 1294–97.) He also testified before Congress on hearings related to the Act. (Tr. 2564:10–2565:13 (Cook); March 1997 Hearing at 120–22; July 2002 Hearing at 25–27.)

Kanwaljeet S. Anand, M.B.B.S. (Bachelor of Medicine/Bachelor of Surgery, equivalent to an M.D.), D.Phil., a licensed physician who is board-certified in pediatrics and pediatric critical care, is a Professor of Pediatrics, Anesthesiology, Pharmacology

and Neurobiology at the University of Arkansas for Medical Sciences, a Pediatric Intensivist at Arkansas Children's Hospital, and a Director of Pain Neurobiology Laboratory at Arkansas Children's Hospital Research Institute. (Tr. 1899:7–1900:7, 1908:1–6, 1909:24–1910:4 (Anand); Ex. Z–5, Curriculum Vitae of Kanwaljeet S. Anand, M.B.B.S., D.Phil. [Anand C.V.].) Dr. Anand has never performed any kind of abortion. (Tr. 1967:16–17 (Anand).) He has written chapters in textbooks on anesthesiology and pain management and has authored over 200 publications, including approximately sixty peer-reviewed articles, mainly on the subject of pain in early life. (Tr. 1914:7–12, 1915:3–13 (Anand).) In addition, Dr. Anand is on the editorial board of the journal *Critical Care Medicine*, and serves as a peer-reviewer for scientific journals in pediatrics, anesthesiology, neurobiology, and behavioral neuroscience. (Tr. 1916:4–13 (Anand).) Dr. Anand is also a member of the International Association for the Study of Pain. (Anand C.V.) He has testified as an expert in the areas of pediatric critical care and pharmacology of anesthetic drugs, but not in any other case involving abortion regulations. (Tr. 1916:14–24 (Anand).) Dr. Anand was recognized as an expert in the fields of neonatology, fetal pain, and pharmacology of anesthetic drugs. (Tr. 1917:19–1918:20 (Anand).)

### F. Abortion Procedures

Because some medical background is essential to understanding the issue of whether the Act requires a health exception, the Court provides a description of second-trimester abortion procedures. A pregnancy is divided into trimesters, with the first trimester lasting until about thirteen weeks LMP, the second lasting until about twenty-four to twenty-six weeks LMP, and the third lasting until birth, or forty weeks LMP. (Tr. 220:2–8 (Grunebaum); Tr. 398:24–399:7 (Johnson); November 1995 Hearing at 99 (statement of Dr. Campbell).) First-trimester abortions, which are not at issue in this case, comprise approximately ninety percent of abortions performed in the United States.[20] (November 1995 Hearing at 99 (statement of Dr. Campbell); Tr. 768:4–5 (Westhoff).) About ten percent of abortions occur during the second trimester. (Tr. 768:5–6 (Westhoff).) The second-trimester abortion methods are D & E, D & X, induction, hysterectomy, and hysterotomy. (Tr. 779:7–8, 802:4–14 (Westhoff); Tr. 220:9–221:1 (Grunebaum); 1176:2–9 (Frederiksen).)

### 1. D & E

D & E is the most common method of abortion used in the second trimester. *See Stenberg*, 530 U.S. at 923, 120 S.Ct. 2597. Approximately ninety-five percent of second-trimester abortions use the D & E procedure. (Tr. 802:9–14 (Westhoff).) Most D & Es in the United States are performed in out-patient settings. (Tr. 443:10–11, 444:5–6, 446:22–447:1 (Johnson); Tr. 230:21–23 (Grunebaum).)

In a D & E procedure, the physician first dilates and softens the woman's cervix so that the contents of the uterus can be removed without injury to the woman. (November 1995 Hearing at 100 (statement of Dr. Campbell).) Physicians typically use osmotic dilators such as laminaria, sometimes in conjunction with cervical

---

**20.** During the first trimester of pregnancy, a physician will use a procedure called suction curettage, or vacuum aspiration, to terminate a pregnancy. During this procedure, the physician inserts a vacuum tube into the uterus to evacuate its contents. (Tr. 771:14–772:4 (Westhoff).) During the first nine weeks of pregnancy a physician may also administer medications such as mifepristone, or RU486, to terminate a pregnancy. (Tr. 745:3–11 (Westhoff).)

ripening agents such as misoprostol. (Tr. 412:24–413:5, 415:5–9, 491:25–492:6 (Johnson); Tr. 672:24–673:19 (Hammond); Tr. 786:10–12 (Westhoff); Tr. 1729:9–13 (Lockwood); Tr. 2163:17–19 (Sprang).) Laminaria sticks are made of seaweed, and when they are placed in the cervix they absorb moisture from the woman's body and slowly expand, gradually opening the cervix. (Tr. 232:10–13 (Grunebaum); Tr. 414:3–7 (Johnson); Tr. 785:10–17, 789:13–16 (Westhoff); Tr. 1068:9–13 (Frederiksen).) The amount of cervical dilation that can be achieved is individual to each woman, but at a minimum, enough dilation is needed for a physician to insert and open the necessary instruments in the cervix. (Tr. 787:23–788-2, 788:19–22, 992:2–993:4 (Westhoff); Tr. 2165:5–7 (Sprang).) According to the Chasen Study, the median degree of cervical dilation in women who underwent a D & E procedure was three centimeters. (Chasen Study, Table III.) Depending on the patient and the physician's practice, the dilation process can take from twelve to forty-eight hours, during which time most women are able to leave the hospital or clinic. (Tr. 211:20–25, 232:15–19 (Grunebaum); Tr. 414:20–23 (Johnson); Tr. 785:23–786:6, 814:6–11, 1000:15–17 (Westhoff); Tr. 1552:19–21, 1572:2–6 (Chasen); Tr. 2164:8–11 (Sprang).)

When the woman returns to the hospital or clinic, she is placed under general anesthesia or conscious sedation, and the physician performs the next phase of D & E— the evacuation of the fetus from the uterus. (Tr. 234:2–10 (Grunebaum); Tr. 786:7–15 (Westhoff); Tr. 1572:7–10 (Chasen); Tr. 1729:17–22 (Lockwood).) The physician inserts forceps or fingers into the uterine cavity, grasps a fetal part and pulls it through the cervix and vagina. (Tr. 786:22–24, 946:12–16 (Westhoff).) The evacuation process involves ripping limbs and tearing parts from the fetus. (Tr. 212:8–11 (Grunebaum); 946:12–16 (West-

hoff).) In an effort to minimize the number of times they insert instruments into the woman's uterus, physicians attempt to remove as much of the fetus as possible with each pass of the instruments into the uterus, but it may take about ten to fifteen passes to remove the entire fetus. (Tr. 794:11–15 (Westhoff); Tr. 1321:23–1322:4 (Weiss); Tr. 849:23–1850:3 (Lockwood); Tr. 2709:6–2710:1 (Bowes).) The fetus may still be living when the physician begins the evacuation process, and because the fetus may not die immediately, it may show signs of life such as a heartbeat until another limb is torn-off or some other act causes death. (Tr. 639:15–21 (Hammond); Tr. 855:7–856:11 (Westhoff); Tr. 1362:9–13 (Weiss).)

After the fetus is taken from the uterus, the physician counts the fetal parts to make sure that the entire fetus has been removed. (Tr. 787:11–13 (Westhoff); Tr. 1413:16–24 (Weiss); Tr. 2493:23–2494:1 (Cook).) The physician then uses a combination of suction and instruments to remove the placenta from the uterus and any remaining fetal parts. (Tr. 787:13–15 (Westhoff); Tr. 2301:7–18 (Clark).) According to the Chasen Study, the evacuation of the fetus from the uterus in a D & E procedure can take from six minutes to an hour; the median procedure time was twenty-two minutes. (Chasen Study, Table III.)

### 2. D & X

D & X involves a procedure in which the fetus is removed intact or nearly intact from the uterus. (November 1995 Hearing at 100–01 (statement of Dr. Campbell); March 1997 Hearing at 121–22 (statement of Dr. Cook).) It is used for late second-trimester abortions after about twenty-two weeks of gestation. (Tr. 1222:3–18 (Frederiksen); 1574:22–1575:5 (Chasen).)

D & X also begins with dilation of the woman's cervix, using similar techniques

as in a D & E. Because D & X requires a greater degree of cervical dilation than D & E (there was a median preoperative dilation of five centimeters for the D & Xs recorded in the Chasen Study compared to a median preoperative dilation of three centimeters for D & E), D & X can often involve longer multiple-day dilations. (Tr. 1512:7–10 (Creinin); Tr. 1754:19–21 (Lockwood); Chasen Study, Table III.) Once adequate dilation is achieved, the physician will extract the fetus in either of two ways.

If the fetus is in a feet-first presentation (or breech position), the physician grasps the fetus's lower extremity with fingers or forceps and pulls the fetus through the cervix and vagina until its head is lodged at the cervical opening. (Tr. 340:15–343:20 (Grunebaum).) At this point, the fetus's arms and legs have been delivered outside the uterus while the fetus is still alive. (Tr. 337:25–338:15 (Grunebaum); Tr. 468:15–24 (Johnson).) With the fetus's head lodged in the cervix, the physician punctures the skull with scissors or crushes the head with forceps. (Tr. 1005:3–6 (Westhoff); Tr. 1224:21–1225:3 (Frederiksen).) The fetus could be moving at the time the skull is crushed. (Tr. 468:15–24 (Johnson).) The physician then drains the fetus's skull by suction, or by using a finger, and the skull collapses. (Tr. 1005:13–15 (Westhoff); Tr. 1141:6–9 (Frederiksen).) The fetus dies when its brain is either drained or sucked from the skull. (Tr. 337:25–338:15 (Grunebaum).) At this point, the fetus is extracted from the uterus. (Tr. 1005:16–19 (Westhoff).)

If the fetus is in a vertex or head-first presentation, D & X may still be used. (Tr. 1225:18–1226:8 (Frederiksen).) In a vertex presentation, the physician uses forceps or scissors to puncture or collapse the fetus's head while it is in the uterus against the cervical opening. (Tr. 1460:25–1461:5 (Paul); Tr. 1678:17–1679:11 (Chasen).) The fetus's brain is then suctioned, allowing the fetus to be removed from the woman's body. (March 1997 Hearing at 122 (statement of Dr. Cook); Tr. 1678:17–1679:11 (Chasen).)

After the fetus is extracted, the physician removes the placenta with surgical instruments. (March 1997 Hearing at 122 (statement of Dr. Cook); Tr. 690:10–12 (Hammond).) According to the Chasen Study, a D & X procedure can take from six to forty-five minutes; the median procedure time was twenty-two minutes. (Chasen Study, Table III.)

A D & X procedure may subject fetuses beyond twenty weeks' gestational age to "prolonged and excruciating pain." (Tr. 1951:3–18 (Anand); Tr. 1882:9–1883:1 (Lockwood); Tr. 2130:18–22 (Sprang).) Because the density of receptors is greater in the fetal skin at about twenty weeks of gestation, and because the mechanisms that inhibit and modulate the perception of pain do not develop until after thirty-two to thirty-four weeks' gestation, there was testimony that a fetus likely feels severe pain while the procedure is being performed. (Tr. 1942:6–1944:10 (Anand).) Dr. Anand testified that the fetus will experience severe pain when its skull is punctured or crushed.[21] (Tr. 1952:17–22.) When questioned about whether they spoke to their patients about fetal pain, Plaintiffs' answers ranged from uncertainty about whether fetuses feel pain to a lack of caring on the matter.[22] (Tr. 1327:24–25,

---

**21.** Dr. Anand stated that he believes a woman should have the right to choose an abortion "with the caveat that it should not cause pain to a fetus." (Tr. 1950:23–1951:2.)

**22.** Most of Plaintiffs' experts acknowledged that they do not describe to their patients what the D & E and D & X procedures entail in clear and precise terms. (Tr. 659:29–660:17 (Hammond); Tr. 795:16–798:17 (Westhoff); Tr. 1071:12–1073:6 (Frederiksen); Tr. 1561:23–1566:8 (Chasen).)

1328:12–14 (Weiss); Tr. 783:1–784:20 (Westhoff); Tr. 512:9–513:9 (Johnson); Tr. 1072:2–17, 1073:7–1074:17 (Frederiksen); Tr. 1596:17–1597:5 (Chasen).)

### 3. Induction

Another common method of second-trimester abortion is induction. Approximately five percent of second-trimester abortions between sixteen and twenty weeks of gestation, and about fifteen percent of second-trimester abortions after twenty weeks of gestation, are performed by induction. (Tr. 779:7–8; 802:9–14 (Westhoff).) Inductions are performed in a hospital setting because the patient must be kept under constant monitoring, often for more than twenty-four hours. (Tr. 222:2–23 (Grunebaum); Tr. 432:18–433:1 (Johnson); Tr. 500:16–551:1 (Hammond); Tr. 1802:21–24 (Lockwood).)

In an induction, a woman is given oral or vaginal prostaglandins to cause the uterus to contract and induce premature labor. (Tr. 222:10–14 (Grunebaum); Tr. 417:24–418:1 (Johnson); Tr. 668:22–669:1 (Hammond); Tr. 1067:15–20 (Frederiksen); Tr. 2106:25–2107:7; Tr. 2612:8–12 (Cook).) Because the uterus is not as responsive to inducing agents in the second trimester as it is at the end of the pregnancy, higher doses of prostaglandin are given to induce contractions. (Tr. 431:4–7 (Johnson).) The woman's cervix is prepared with laminaria or mifepristone (RU486), in conjunction with misoprostol. (Tr. 1731:6–10 (Lockwood).) After a period of labor, the cervix dilates and the fetus is expelled. (Tr. 211:5–8, 222:15–17 (Grunebaum); Tr. 2107:7–10 (Sprang).)

An induction can take anywhere from fewer than twelve hours to forty-eight hours or more. (Tr. 222:20–23 (Grunebaum); Tr. 669:6–10 (Hammond); Tr. 1067:19–23 (Frederiksen); Tr. 1580:13–15 (Chasen); Tr. 1731:3–17 (Lockwood).) If the physician uses RU486 along with misoprostol to prepare the cervix, the period from the beginning of labor induction to delivery can be under five hours. (Tr. 1731:11–14 (Lockwood).) Without pretreatment with RU486, the procedure usually takes about twelve hours. (Tr. 1731:15–17 (Lockwood).)

### 4. Hysterectomy and Hysterotomy

Hysterectomy and hysterotomy are also available as second-trimester abortion methods, but are rarely used. (Tr. 220:15–17 (Grunebaum); Tr. 802:4–8 (Westhoff); Tr. 1176:2–9 (Frederiksen).) In a hysterectomy, the woman's entire uterus is removed, rendering her infertile. (Tr. 220:17–221:5 (Grunebaum).) A hysterotomy, like a caesarian section, involves opening up the woman's abdomen and removing the fetus and placenta through an incision in the uterus. (Tr. 220:19–22 (Grunebaum); Tr. 1077:19–24 (Frederiksen); Tr. 1819:1–3 (Lockwood).) Because of the potential risk that the uterine scar may rupture during labor, a woman who has had a hysterotomy must have all future pregnancies delivered by caesarian section. (Tr. 1078:9–17 (Frederiksen); Tr. 1819:4–8 (Lockwood).)

### G. Trial Testimony Regarding Comparative Safety of Abortion Procedures

There was substantial testimony at trial about the experts' views on the comparative risks and benefits of D & X and other second-trimester abortion methods. Plaintiffs argue that D & E is safer in many circumstances than induction, that D & X is merely a variant of D & E, and that D & X is the safest form of D & E. The Government contends that the alternatives are always as safe or safer than D & X.

### 1. Comparison of D & E to Induction

The testimony at trial concerned the comparative risks of D & E and medical induction abortion. Experts testifying for both sides agreed that induction abortion

and D & E are safe procedures. (Tr. 420:3–15 (Johnson); Tr. 541:19–22 (Hammond); Tr. 810:12–16 (Westhoff); Tr. 1578:1–17 (Chasen); Tr. 1743:6–20, 1746:4–14 (Lockwood); Tr. 2306:14–22 (Clark).) Experts on both sides also expressed their opinions that D & E is generally a safer procedure than induction between eighteen and twenty weeks' gestation. Dr. Frederiksen testified that, in her opinion based on published studies, D & E is safer than induction throughout the second trimester. (Tr. 1051:18–1053:6.) Dr. Lockwood testified that prior to twenty weeks' gestation, D & E is safer than induction "since there is a higher rate of retained placentas and perhaps a slightly higher rate of infection with medical abortions and since we believe the incidence of perforation and hemorrhage is likely less." (Tr. 1749:14–23.) Dr. Johnson stated that D & E is safer between sixteen and twenty weeks. (Tr. 421:2–422:6.) Dr. Sprang testified that prior to eighteen or nineteen weeks, D & E is safer than induction, and that prior to twenty weeks some studies suggest that D & E presents advantages in terms of morbidity and mortality. (Tr. 2154:7–17.) Dr. Clark does not recommend induction abortions prior to eighteen weeks because induction is more difficult for the mother than D & E at that gestational age. (Tr. 2405:22–2406:8.)

After twenty weeks' gestation, experts testified that D & E and induction are comparable in terms of safety. (Tr. 421:7–14 (Johnson); Tr. 690:13–25 (Hammond); Tr. 810:12–24 (Westhoff); Tr. 1578:1–21, 1682:8–23 (Chasen); Tr. 1749:24–1750:3 (Lockwood).) As noted above, Dr. Frederiksen believes that D & E is always safer than induction during the second trimester. (Tr. 1052:18–1053:6.) Dr. Sprang indicated that induction was safer after twenty weeks' gestation because it does not involve the use of instruments in the uterus. (Tr. 2154:21–2155:1.)

According to some witnesses, induction abortion can last between less than twelve hours and forty-eight hours or more. (Tr. 1067:9–23 (Frederiksen); 222:20–23 (Grunebaum); 669:6–10 (Hammond); 1580:13–15 (Chasen); 1731:3–17 (Lockwood).) Some physicians opined that the shorter time leads to less risk of complications. (Tr. 230:10–20 (Grunebaum); 421:23–422:16, 432:1–8 (Johnson); 1066:20–1069:2, 1079:9–13, 1080:15–1081:3 (Frederiksen); 2406:9–2407:7 (Clark).)

Dr. Johnson noted the lower risk of bleeding and infection during the shorter D & E procedure. (Tr. 421:23–422:16.) Dr. Frederiksen agreed that safety advantages accompanying shorter operating time included less blood loss, less exposure to anesthesia, and a lower risk of infection from exposure of the uterus to the contents of the vaginal area. (Tr. 1066:2–8, 1079:9–13, 1080:18–1081:3.)

Medical induction abortion requires hospitalization, while D & E is done on an outpatient basis. (Tr. 1580:13–15 (Chasen).) According to Dr. Grunebaum, women are exposed to a greater chance of infections during induction because of the presence of antibiotic-resistant organisms in hospitals. (Tr. 231:2–8.) Some physicians stated that induction can be emotionally traumatic for patients with wanted pregnancies because they are performed on the hospital's labor and delivery floor, surrounded by mothers giving birth to healthy babies. (Tr. 231:9–20 (Grunebaum); Tr. 1068:4–7 (Frederiksen).)

In some cases, an induction may fail to expel the fetus, a fetal part may become stuck in the cervix obstructing delivery, or the condition of the patient may deteriorate. In such circumstances, the fetus must be surgically removed, using the same techniques as in a D & E or D & X. (Tr. 363:19–22 (Grunebaum); Tr. 445:13–20, 446:6–12 (Johnson); Tr. 580:6–12,

581:3–6 (Hammond); Tr. 823:19–25 (Westhoff); Tr. 1148:12–19 (Frederiksen); Tr. 1587:4–15 (Chasen); Tr. 1832:21–1833:2, 1851:18–1852:7 (Lockwood).)

Physicians testified about the risk that the woman will not expel the placenta during an induction. (Tr. 1744:4–8 (Lockwood).) The experts' opinions on the frequency of placenta retention ranged from five to thirty percent of inductions. (Tr. 223:10–17 (Grunebaum) (ten to thirty percent); Tr. 580:19–581:2 (Hammond) (fifteen to thirty percent); Tr. 823:25–824:3 (Westhoff) (ten to twenty-five percent); Tr. 1731:21–24 (Lockwood) (five percent with aggressive doses of RU486, ten to twenty percent without RU486); Tr. 2155:2–7, 16–20 (Sprang) (fifteen to twenty percent); Tr. 2581:24–2581:4 (Cook) (five to ten percent, less with misoprostol).) Dr. Lockwood testified that the risk of retained placenta decreases with each gestational week, and can be reduced with the use of RU486. (Tr. 1745:3–8, 1731:21–24.)

A surgical procedure is employed if the placenta does not deliver within one-half hour to two hours after the fetus is expelled. (Tr. 444:25–445:3–12 (Johnson); Tr. 584:17–586:2, 689:9–15 (Hammond); Tr. 1732:8–15 (Lockwood); Tr. 2553:1–18, 2582:5–13 (Cook).) D & E also involves the surgical removal of the placenta. (Tr. 690:10–12 (Hammond); Tr. 2553:8–18 (Cook).) Dr. Hammond testified that there is a greater risk of hemorrhage and infection the longer the placenta is retained. (Tr. 584:17–19.) Dr. Weiss stated that removal of the placenta during a D & E is fairly rapid with a decreased risk of infection. (Tr. 1330:7–14.) With regard to removal of the placenta during an induc-tion, Weiss testified that there is a greater chance of infection because membranes have been ruptured during the procedure. (Tr. 1330:15–24.; *see also* Tr. 1421:16–1422:9.)

There was testimony that induction carries less risk of uterine perforation than D & E because D & E involves the use of sharp instruments inside the woman. (Tr. 951:11–19 (Westhoff).) Dr. Lockwood testified that uterine perforation from removal of the placenta after an induction is extremely rare. (Tr. 1745:15–1746:1.)

Some experts opined that the force of contractions during induction may cause uterine rupture. (Tr. 224:4–1 (Grunebaum); Tr. 429:8–19, 434:8–20, 436:13–437:15 (Johnson); Tr. 815:1–816:6, 818:1–14 (Westhoff); Tr. 1079:14–1080:4, 1081:2160:6–8, 2161:11–25 (Sprang).) Women who have undergone prior uterine surgery, such as classical cesarean sections,[23] hysterotomy, and myomectomy involving the removal of fibroids, are at a greater risk of uterine rupture and therefore D & E may be safer than induction for these women. (Tr. 224:4–9 (Grunebaum); Tr. 815:1–8 (Westhoff); Tr. 1582:14–1583:7 (Chasen); 1818:2–8, 1819:1–11 (Lockwood); 2160:6–11 (Sprang); 2357:25–2358:6, 2358:22–2359:17, 2407:21–2408:7, 2408:19–24 (Clark); 2712:1–10 (Bowes).) D & E, unlike induction, does not involve the contractions of the muscles in the uterus. (Tr. 1079:14–1080:4 (Frederiksen); Tr. 1584:22–1585:9 (Chasen).)

There was testimony that a woman with placenta previa, a condition in which the placenta prevents access to the vaginal

---

**23.** In a classical caesarean section, the physician makes a vertical incision in the upper portion of the uterus. (Tr. 2354:23–2356:10 (Clark).) The more common caesarean section involves a crosswise incision in the lower portion of the uterus. (Tr. 2356:14–22 (Clark).) According to Dr. Lockwood, there are approximately 1,000,000 caesarean sections performed each year in the United States, and approximately one to two percent of those are classical caesarean sections. (Tr. 1818:23–25.)

canal from the uterus, may bleed excessively during an induction abortion. (Tr. 228:20–229:10 (Grunebaum); 818:15–21 (Westhoff); 1081:4–21 (Frederiksen); 1819:25–1821:10 (Lockwood); 2352:12–2353:7 (Clark).)

The experts also testified as to several other maternal conditions that, in their opinions, make D & E the preferred second-trimester abortion procedure: bleeding disorders (Tr. 441:18–442:18 (Johnson); Tr. 593:17–594:17 (Hammond); Tr. 820:3–20 (Westhoff)); preeclampsia (or toxemia) (Tr. 2408:25–2409:18 (Clark)); chorioamnionitis (or infection in the uterus during pregnancy) (Tr. 456:1–14 (Johnson); Tr. 814:12–25 (Westhoff)); predisposition to infection or sepsis (Tr. 440:11–441:11 (Johnson); Tr. 1144:14–21, 1449:7–20 (Frederiksen)); acute fatty liver of pregnancy (the transference of fatty acids from the fetus to the mother's liver) (Tr. 1145:14–1147:8 (Frederiksen)); peripartum cardiomyopathy and certain cardiac conditions (Tr. 1009:4–8 (Westhoff); Tr. 229:20–230:2 (Grunebaum); Tr. 438:1–5 (Johnson); Tr. 1449:7–20 (Paul); Tr. 1585:24–1587:3 (Chasen)); and certain types of pulmonary disease (Tr. 440:11–441:2 (Johnson)). Additionally, physicians testified that D & E is preferred over induction when the fetus has hydrocephalus (Tr. 821:16–822:1 (Westhoff)), or when the fetus is lying sideways in the uterus (called a transverse lie), because of the increased risk of uterine rupture (Tr. 226:9–22) (Grunebaum).

The Government introduced the testimony of Dr. Clark to contradict the other testimony regarding specific maternal medical conditions that would make D & E preferable to medical induction. Dr. Clark testified that women with acute fatty liver pregnancy when the liver is not so affected that blood clotting factors are low could safely undergo either D & E or induction. (Tr. 2344:4–16.) If the clotting were affected, surgical procedures would be con-

traindicated, and thus induction would be safer. (Tr. 2344:17–22.) D & E and induction, according to Dr. Clark, are equally safe (and sometimes induction is safer) for patients with auto-immune disorders (Tr. 2349:6–15), cancer (Tr. 2373:20–24); cardiac disease (Tr. 2328:7–11, 2328:11–17); cardiomyopathy (a form of heart disease) (Tr. 2333:23–2334:5); chorioamnionitis (Tr. 2347:18–20, 2348:2–3); HELLP Syndrome (severe toxemia when the patient has low blood platelets) (Tr. 2341:24–2342:1); preeclampsia (Tr. 2369:16–22, 2370:22–2371:4); transplanted organs (Tr. 2375:6–11); blood clotting disorders (Tr. 2350:4–11); and Von Willebran's disease (an inherited clotting disorder) (Tr. 2348:8–2349:15).

Dr. Clark also testified that it was incomprehensible to him how Dr. Westhoff, one of Plaintiffs' experts, could testify that she only performs previability abortions, but once performed a D & X when a woman developed peripartum cardiomyopathy. According to Dr. Clark, peripartum cardiomyopathy is a form of heart failure that by definition does not develop during the second trimester of pregnancy. (Tr. 2331:4–19.) While Dr. Johnson testified that fluid shifts in women with cardiac conditions are relevant to which abortion procedure is safer during the second trimester (Tr. 438:2–5), Dr. Clark stated that the real fluid shifts occur *after* the baby is delivered, and are minimal during the second trimester thus having little effect on the choice of abortion procedure (Tr. 2323:24–2325:4).

## 2. Comparison of D & X to D & E

Experts for each side provided substantial testimony on the comparative risks and benefits of D & X and D & E. According to Plaintiffs, the testimony demonstrates that as compared to D & E, D & X: (1) offers four safety advantages, each of which, among other things, decrease a

woman's risk of infection as a result of undergoing an abortion; (2) is a safer procedure for women with certain medical conditions; and (3) may be a better procedure when certain fetal anomalies are present. The Government counters that the testimony does not establish these claims and that D & X may in fact create additional health risks to women.

Plaintiffs' experts testified that a physician will insert forceps into the uterus fewer times during a D & X as compared to a D & E. (Tr. 235:14–236:6, 381:18–382:2 (Grunebaum); Tr. 564:1–566:2, 567:7–15, 568:19–569:2, 592:2–9 (Hammond); 824:18–825:2 (Westhoff); 447:18–448:19 (Johnson); see also Ex. 70, Maureen Paul, *A Clinician's Guide to Medical & Surgical Abortion* 136 (1999) [*Clinician's Guide*].) Some experts also testified that fewer instrument passes into the uterine cavity reduces the risk of uterine perforation. (Tr. 235:14–236:6, 381:18–382:2 (Grunebaum); Tr. 447:18–448:19 (Johnson); Tr. 1439:1–6, 1441:10–20 (Paul).) Experts for both sides agreed that uterine perforation—which may lead to hemorrhage and infection, injury to maternal tissue, and require additional surgery—is one of the most feared and dangerous complications of D & E. (Tr. 234:18–22 (Grunebaum) (testifying that uterine perforation is "the most dangerous complication of a D & E"); Tr. 1823:14–1825:6 (Lockwood) (noting that "without a doubt" the most feared complication of a D & E is uterine perforation); Tr. 1055:3–19, 1059:11–1160:7 (Frederiksen) (testifying on consequences of uterine perforation); Tr. 1441:20–1442:5 (Paul) (same); 1023:6–16 (Westhoff) (same); 1590:25–1591:5 (Chasen) (same).) Two of the Government's experts agreed that a reduction in the number of instrument passes into the uterus translates into a reduced risk of uterine perforation and attendant complications such as infection and hemorrhage. (Tr. 1825:9–16 (Lockwood); Tr. 2548:5–23 (Cook).)

Government experts testified that although D & E involves increased instrument passes, if properly performed there would not be an increased risk of uterine perforation. For example, Dr. Clark stated that if D & E is properly and carefully performed, repetitive passes would not pose an increased risk of uterine perforation. (Tr. 2387:24–2388:8.) There was also testimony that there are no comparison studies about whether D & X is safer than D & E in terms of lessening the number of instrument passes, and that in practice the risk of uterine perforation from forceps is minimal. (Tr. 1212:19–24 (Frederiksen) (testifying that uterine perforation from forceps is "pretty rare"); Tr. 1461:7–11 (Paul) (discussing lack of comparison studies).) Finally, the Government's experts testified that even though fewer instrument passes may reduce the risk of cervical laceration, other aspects of D & X (such as the greater cervical dilation or the fact that the fetus's head is crushed in proximity to the cervix) may themselves lead to an increased risk of uterine perforation. (Tr. 1824:10–18 (Lockwood) (stating that there is a need for further retrospective studies to determine whether other aspects of the D & X procedure place a woman at increased risk of uterine perforation).)

Second, Plaintiffs' experts testified that during a D & X, the uterus and cervix are less likely to be exposed to fetal bone and skull fragments, which also reduces the risk of uterine perforation and infection. (Tr. 447:4–448:19 (Johnson); Tr. 1825:17–20 (Lockwood).) For instance, Dr. Hammond explained that in a relatively intact procedure, fewer fetal bony parts will be exposed that can cut the cervix as the fetal parts are removed from the patient. (Tr. 565:7–19; 568:19:570:7; see also Tr. 1324:4–23, 1330:25–1332:8 (Weiss); Tr. 1590:1–17, 1592:9–15, 1611:11:1612:2 (Chasen); 793:2–794:5, 824:18–825:2 (West-

hoff).) Government experts testified that the likelihood that D & E would expose women to fetal bone and skull fragments to a greater degree than would a D & X is hypothetical. (Tr. 2114:22–2115:1 (Sprang) (testifying that damage from bony parts passing through the cervix is a "very, very theoretic possibility").) There was also testimony that there is no controlled study or scientific article that addresses the risk of injury from bony parts during D & E. (Tr. 2115:1–2, 11–12 (Sprang); see also Tr. 1214:9–13 (Frederiksen); Tr. 1527:18–21 (Weiss).)

Third, Plaintiffs' experts maintained that a D & X significantly reduces the risk that fetal parts will be retained in the uterus, thereby decreasing the risk of infection, hemorrhage, and infertility as complications. (Tr. 248:13–249:9 (Grunebaum); Tr. 565:7–566:22, 570:8–571:18 (Hammond); 824:18–825:7 (Westhoff); 1045:13–22, 1053:7–20, 1060:8–1064:18 (Frederiksen); 1322:25–1324:3, 1324:16–23, 1421:2–12 (Weiss); 1441:10–16 (Paul); 1590:21–24, 1592:16–1593:9 (Chasen).) They further testified that even though a physician may use ultrasound after a D & E to assess whether fetal parts have been removed, ultrasound would not detect certain soft tissue or small pieces of retained bone. (Tr. 249:10–24 (Grunebaum); Tr. 1333:13–22 (Weiss).) The Government's experts offered counter testimony that, if properly performed fetal parts should not be retained at the conclusion of a D & E. For example, Dr. Cook testified that physicians may count the parts of a fetus aborted through D & E to ensure no parts are retained in the uterus. (Tr. 2493:23–2494:1; see also Tr. 787:11–13 (Westhoff); Tr. 1413:16–24 (Weiss).)

Fourth, some of Plaintiffs' experts opined that the shorter time required to perform a D & X reduces a patient's exposure to anesthesia, the risk of infection, and potentially, bleeding. (Tr. 248:13–

249:9, 249:25–250:25, 253:15–254:3, 359:2–25 (Grunebaum); Tr. 565:7–567:6, 573:17–575:7 (Hammond); Tr. 826:22–828:2 (Westhoff); Tr. 1322:25–1324:3, 1333:23–1334:6, 1417:22–1419:25 (Weiss); Tr. 1590:1–20, 1611:11–1612:2, 1679:20–1680:15 (Chasen); Tr. 2709:6–16 (Bowes).) Dr. Lockwood, a Government expert, testified that a shorter surgical procedure carries less risk of bleeding, infection, and exposure to anesthesia. (Tr. 1825:21–1826:9.) There was testimony, however, that these safety advantages are merely hypothetical and have not been meaningfully quantified. (Tr. 361:21–362:2 (Grunebaum) (testifying that decreased exposure to anesthesia during a D & X abortion is only a "hypothetical benefit" and that he has never measured this benefit).) Moreover, the Chasen Study itself found no difference between D & X and D & E in procedure time or estimated blood loss. (Tr. 1629:13–15 (Chasen); Chasen Study, Table III.)

Plaintiffs' experts also maintained that D & X may be a safer procedure than D & E for women with certain medical conditions. For example, experts for Plaintiffs contended that D & X is generally safer than D & E for women who suffer from bleeding disorders and who are at risk of hemorrhage. Dr. Hammond thus explained that the shorter procedure time of D & X, and the reduced risk of uterine perforation and cervical laceration, minimizes the risk of blood loss and hemorrhage. (Tr. 586:22–587:6 (Hammond) ("[A] patient who has a bleeding disorder is at a greater risk of hemorrhage. During the course of a D & E, if I am able to perform the D & E relatively intact ... there is less of a risk of perforation, less of a risk of cervical laceration, which would be complications that would be even more devastating to a patient who has a particular bleeding problem. So to the extent I am less likely to run into those complications in these patients, it is safer for me to do

the D & E as intact as possible."); *see also* Tr. 588:9–18, 454:8–455:1 (Johnson); Tr. 1334:7–18 (Weiss).)

Moreover, according to some of Plaintiffs' experts, D & X may be a safer procedure than D & E for infection-prone women or women who have compromised immune systems. They based this proposition on the contention that the reduced instrument passes and operating time of a D & X decreases the risk of infection. (Tr. 235:14–236:6, 381:18–382:2 (Grunebaum); Tr. 564:1–566:2, 567:7–15, 568:19–569:2, 592:2–9 (Hammond); Tr. 824:18–825:2 (Westhoff); Tr. 447:18–448:19 (Johnson); Tr. 1590:1–20, 1611:11–1612:2, 1679:20–1680:15 (Chasen).) Specifically, some physicians indicated that because women with chorioamnionitis are at a higher risk of intrauterine perforation, D & X and its reduced risk of uterine perforation offer these women safety advantages. (Tr. 588:19–590:7 (Hammond); Tr. 185:2–18 (Cain); Tr. 454:8–456:14 (Johnson); Tr. 1141:13–1144:21 (Frederiksen); Tr. 250:15–252:20 (Grunebaum); Tr. 1334:7–14 (Weiss); Tr. 1826:16–1827:9 (Lockwood).)

The testimony of some of the Government's experts attacked the argument that D & X may be safer than D & E for women with certain health conditions. (Tr. 2348:19–2349:5 (Clark).) Dr. Clark testified regarding maternal medical conditions, "[T]here simply … remains no … maternal medical condition for which D & X would be necessary to preserve the life or health of the mother. There are always equally if not more safe alternatives that do not involve D & X." (Tr. 2377:23–2378:2.) The Government's experts also argued that D & X does not offer safety advantages for women with bleeding disorders, low platelets, and clotting problems. (Tr. 2538:2–7 (Cook) (disagreeing with Dr. Hammond's testimony that D & X could offer safety advantages for women with such conditions).)

In addition, Plaintiffs' experts presented testimony that D & X may be preferable to D & E if certain fetal anomalies exist. Dr. Westhoff contended that D & X offers safety advantages for a woman carrying a fetus with hydrocephaly, a condition in which excessive fluid in the brain leads to an enlargement of the fetal head. (Tr. 821:16–822:1 (Westhoff).) According to experts for both sides, because a fetus with hydrocephaly has an enlarged head, it is difficult for a physician to grasp the fetal head with forceps and then remove it from the woman's body, as required during a D & E. (Tr. 450:16–451:14 (Johnson); Tr. 565:7–566:11 (Hammond); Tr. 1826:10–15 (Lockwood).) In contrast, Dr. Chasen testified that during a D & X the fetal head can be brought down to the cervix and an incision is made to release the fluid, thereby allowing the head to pass safely through the cervix; as a result, some physicians testified that D & X is a safer alternative than D & E in such pregnancies. (Tr. 1600:19–1601:9 (Chasen); *see also* July 2002 Hearing at 189, 196–97 (AMA Report of the Board of Trustees).)

Experts for the Government countered that D & X is never necessary in cases where fetal anomalies are present. Dr. Clark, for instance, argued that hydrocephalic fetuses are usually delivered to live birth and even if a fetus has an enlarged head, either an induction or a D & E procedure may be used once the fluid is drained. (Tr. 2380:18–23 (testifying that after fluid is drained from the brain a physician may use either induction or D & E).)

Finally, some of Plaintiffs' experts stated that a D & X is preferable to D & E because a more intact fetus permits testing and diagnosis of fetal anomalies. (Tr. 1098:7–11 (Baergen) (testifying that "in

general, the more intact a specimen is the more likely you are able to diagnose fetal anomalies. And the more anomalies and specific abnormalities that you can identify, the more likely you are to be able to make a diagnosis of what disease or disease process is affecting the fetus"); Tr. 236:7–238:24 (Grunebaum); Tr. 1602:19–1603:13 (Chasen).) Dr. Baergen contended that an intact placenta likewise will permit a more appropriate diagnosis of certain fetal anomalies and also will increase the likelihood that a woman with maternal health conditions will receive proper diagnosis. (Tr. 1113:24–1115:13, 1118:20–1119:4, 1136:13–15 (Baergen).)

The Government's experts offered contrary testimony indicating that a D & X is not necessary for fetal diagnoses. Dr. Lockwood testified that unless there is a central nervous system condition that should be evaluated, there is "rarely . . . any need for full anatomic surveillance" of an aborted fetus. (Tr. 1771:21–1772:2 (Lockwood).) Moreover, a D & X will impair the facial structure of a fetus, diminishing the usefulness of an intact fetus to diagnose abnormal facial features. (Tr. 1126:21–24 (Baergen).) Dr. Baergen also testified that the lack of a brain would make it difficult to diagnose brain anomalies in fetuses aborted through D & X. (Tr. 1126:1–11.) A Government expert also stated that the usefulness of an intact fetus for testing of fetal abnormalities is a matter that has not been studied and therefore is not supported by the medical literature. (Tr. 1771:21–1772:19 (Lockwood).) Finally, there was testimony that to obtain a truly intact fetus for diagnosis of fetal anomalies, a physician must perform induction, belying Plaintiffs' claim that D & X is necessary to properly diagnose fetal anomalies. (Tr. 1220:18–20 (Frederiksen).)

## H. Testimony Regarding Possibility of Effecting Fetal Demise Prior to Abortion Procedure

The Government presented testimony that physicians could avoid running afoul of the Act by killing the fetus prior to evacuating the uterus. Because the Act's definition of partial-birth abortion is limited to circumstances when the physician "deliberately and intentionally vaginally delivers a *living* fetus," 18 U.S.C. § 1531(b)(1)(A) (emphasis added), this testimony was meant to demonstrate that the Act permits a D & X when necessary to preserve the mother's life or health as long as the physician causes the death of the fetus before removing the fetus from the uterus.

Potassium chloride ("KCl") may be injected into the fetal heart to kill the fetus before performing an abortion. (Tr. 1149:7–16 (Frederiksen); Tr. 1635:18–1636:4 (Chasen); Tr. 1759:24–1760:5 (Lockwood).) KCl is an electrolyte that in high concentrations will cause the fetal heart to stop. (Tr. 1760:18–20 (Lockwood).) Dr. Lockwood testified that he was not aware of any risks to maternal health posed by injecting KCl, and the amount of KCl used to ensure fetal death does not pose any risk to the woman. (Tr. 1762:20–25.)

Digoxin, a cardiac medication that decreases the heart rate, according to Dr. Lockwood, may be injected directly into the fetal heart, a fetal muscle, the amniotic fluid, or the umbilical cord. (Tr. 1761:23–1762:16.) Dr. Lockwood testified that in his opinion it takes varying levels of skill to inject digoxin: much skill when injecting into the umbilical cord, more skill when injecting into the fetal heart, some skill when injecting into fetal muscle, and then little skill to inject into the amniotic fluid. (Tr. 1762:2–16.) Dr. Lockwood also stated that digoxin may cause women to vomit or become nauseous. (Tr. 1764:2–7.)

Congress also heard testimony on inducing fetal demise prior to abortion procedures. Dr. Rutherford stated in a letter made part of the March 2003 Hearing record:

[T]here is no excuse for performing the D & X procedure on living fetal patients. Given the time that these physicians spent preparing for their procedure, there is no reason not to have performed a lethal fetal injection which is quickly and easily performed under ultrasound guidance, similar to amniocentesis, and carries minimal maternal risk.

(March 2003 Hearing at 111; *see also* July 2002 Hearing at 12 ("Even if there were such a situation [when D & X would be the only appropriate abortion procedure], the fetus could be injected with Digoxin or KCL, or the [umbilical] cord could be cut at the start of the procedure, in order to kill the fetus ....") (letter from Dr. Aultman); November 1995 Hearing at 247 ("Another approach [to D & X], which I favor and which is followed by some other physicians, is to induce fetal demise on the first or second day of treatment of the cervix.") (letter from Dr. Hern).)

Plaintiffs presented expert testimony at trial that challenged the efficacy and safety of using KCl and digoxin to kill the fetus prior to emptying the uterus. Dr. Frederiksen testified that it is difficult to ensure fetal demise unless the physician can inject KCl or digoxin directly into the fetal heart. (Tr. 1150:10–1151:4.) In addition, Frederiksen opined that there is some risk to the mother if, for example, she had an infection in her uterus, which might be spread by injecting a needle and then withdrawing it. (Tr. 1152:8–1153:4.) An increased chance of infection might also arise, according to Frederiksen, if the woman has scar tissue in the abdomen from prior surgical procedures. (Tr. 1153:5–12.) Dr. Frederiksen testified that she believes it would be unwise to inject a feticidal agent into a women with certain bleeding disorders because of the risk of hemorrhage. (Tr. 1153:13–21.)

Other physicians gave similar testimony. (*See, e.g.,* Tr. 1485:11–1488:23 (Creinin) (stating needle could hit a maternal blood vessel and carries risks without benefit to the mother); Tr. 2710:8–2711:19 (Bowes) (testifying that there was no medical reason to subject women to risks associated with injecting feticidal agents even though risks were small).) Dr. Weiss stated that he generally does not take steps to kill the fetus prior to evacuating the uterus because any such step would increase the time of the procedure, require an additional puncture of the mother's body, and may produce bleeding or damage to the uterus. (Tr. at 1355:8–17.)

## I. Trial Testimony Regarding Congress's Factual Findings

### 1. Congress's Findings Regarding the Risks of "Partial–Birth Abortion"

Congress made specific factual findings regarding the risks of "partial-birth abortion" in section 2(14) of the Act. Congress found that "partial-birth abortion poses risks to the health of a woman undergoing the procedure" and that "partial-birth abortion is never medically indicated to preserve the health of the mother; is in fact unrecognized as a valid abortion procedure by the mainstream medical community; [and] poses additional health risks to the mother." Act, §§ 2(14)(A), (O), 117 Stat. at 1204, 1206. Plaintiffs offered testimony that Congress's findings are either patently false or were reached despite a division of medical opinion on the matter. The Government argues that obstetricians and gynecologists offered their views to Congress on the medical necessity of the procedure and that Congress was justified in relying on this testimony to arrive at its factual findings.

Congress found that D & X posed the following risks to women: (1) "an increase in a woman's risk of suffering from cervical incompetence, a result of cervical dilation making it difficult or impossible for a woman to successfully carry a subsequent pregnancy to term"; (2) "an increased risk of uterine rupture, abruption, amniotic fluid embolus, and trauma to the uterus as a result of converting the child to a footling breech position"; and (3) "a risk of lacerations and secondary hemorrhaging due to the doctor blindly forcing a sharp instrument into the base of the unborn child's skull ... which could result in severe bleeding." *Id.* § 2(14)(A), 117 Stat. at 1204.

First, Plaintiffs argue that there is a division of medical opinion regarding Congress's finding that a woman faces an increased risk of cervical incompetence when undergoing a D & X. Plaintiffs' experts testified that induction involves greater cervical dilation than D & X, contradicting the findings on cervical incompetence. (Tr. 789:1–790:15 (Westhoff).) In addition, Plaintiffs argue that although Congress's findings point to an increased risk of cervical incompetence and that some of the Government's experts expressed similar concerns about D & X, neither cited to any relevant data to support their claim. (Tr. 1840:1–18 (Lockwood) (testifying that there are no published peer-reviewed studies showing correlation between second-trimester abortions and cervical incompetence or prematurity); Tr. 2168:16–24 (Sprang) (acknowledging that he knows of no studies to examine the effect of laminaria dilation on cervical incompetence).)

The only published study comparing the safety of D & E and D & X, coauthored by Plaintiff Dr. Chasen, raises the possibility that D & X may lead to an increased risk of premature birth. Dr. Clark testified that the study showed a nearly "threefold increased risk of premature birth [for women in the D & X group] along with a plausible biological explanation for why that might occur, namely, twice the dilation which accompanies this procedure."[24] (Tr. 2386:10–13; *see also* Tr. 2122:14–21 (Sprang) (testifying that the Chasen study showed a trend that D & X may increase the risk of preterm birth, but that further study was required to reach a conclusion on the issue); Tr. 2546:7–2547:8 (Cook) (discussing preterm delivery in women who previously underwent an abortion and that the Chasen study "shows a disturbing trend toward increased risk of preterm deliveries specifically as a result of the D & X procedure").) Dr. Clark testified that the study was worrisome, and that he would feel ethically obligated to inform his patients considering undergoing D & X of the study's results. (Tr. 2386:4–13, 2391:10–2392:18.)

Plaintiffs counter that Dr. Chasen's study does not provide any evidence to validate Congress's findings about cervical incompetence. Plaintiffs offered the rebuttal testimony of Dr. Howell, the administrator of a research program (and not an obstetrician and gynecologist), who explained that the preterm delivery rates between the D & X and D & E groups were not statistically meaningful.[25] According to Dr. Howell, the difference in preterm delivery rates between the two groups resulted in a "P value" of 0.30.[26]

---

**24.** Dr. Chasen acknowledged that he initiated the study with the knowledge that the Act was pending before Congress. (Tr. 1615:2–3, 1616:2–9 (Chasen).)

**25.** Plaintiffs did not attempt to offer as rebuttal the testimony of Dr. Chasen's coauthor or a peer reviewer of the manuscript.

**26.** Dr. Howell defined "P value" as the measure that demonstrates whether there is a statistically significant difference between the

(Tr. 2677:20–2678:7; Chasen Study at 3 (noting P value of 0.30).) Howell testified that such a P value indicates that there is a thirty percent probability that the results of the Chasen Study were merely due to chance alone. (Tr. 2678:10–2679:2, 2683:5–2684:7; *see also* Tr. 2121:13–17 (Sprang) ("I think it is very difficult to really put much interpretation and much weight on [the Chasen Study] because the numbers are so small.").) Dr. Clark testified that the fact that there is a thirty percent probability that the results were due to chance means that there is "a 70 percent chance that it in fact is a true, meaningful, increased risk." (Tr. 2429:16–23.) In sum, because of the small size of the D & E and D & X groups, Plaintiffs argue that the Chasen Study does not offer meaningful statistical data on the risk of preterm delivery following a D & X.

Second, Congress concluded that women who undergo a D & X face:

> an increased risk of uterine rupture, abruption, amniotic fluid embolus, and trauma to the uterus as a result of converting the child to a footling breech position, a procedure which, according to a leading obstetrics textbook, "there are few, if any, indications for * * * other than for delivery of a second twin."

§ 2(14)(A), 117 Stat. at 1206. According to Dr. Grunebaum, the statement that Congress quoted is taken from a section of a leading obstetrics textbook, *Williams Obstetrics,* which is discussing a conversion to a footling breech position during *term delivery,* and not during an abortion.[27] (Tr. 278:3–279:9; *see also* June 1995 Hearing at 61 (excerpt from *Williams Obstetrics* ).) Plaintiffs point to testimony offered by experts for both sides to undermine the premise of this finding, namely that during a D & X procedure the physician will convert the child to a footling breech position, which may pose health risks to women. Dr. Lockwood, a Government expert, testified that approximately one-third of fetuses present in breech during the second trimester, obviating the need to convert the fetus. (Tr. 1828:15–1829:11 (Lockwood); *see also* Tr. 463:20–464:8 (Johnson); 787:23–788:16, 890:25–891:5 (Westhoff).) Moreover, testimony was offered that some physicians will only perform a D & X if the fetus is already in a breech position and therefore would never convert the fetus to a footling breech position. (Tr. 261:6–12; 277–9–21 (Grunebaum); 1225:18–1226:4 (Frederiksen); 1458:20–22 (Paul).)

Third, Congress found that there are risks of "lacerations and secondary hemor-

two groups that a researcher is comparing, or whether an observed difference is likely due to chance alone. (Tr. 2678:10–2680:7 (Howell).) According to Dr. Howell, a P value of less than or equal to 0.05, or five percent probability that the outcome is due to chance, is the minimum "indication of statistical significance." (Tr. 2680:8–2681:13 (Howell).)

**27.** A fetus may present in three positions during pregnancy: footling breech (*i.e.,* when the fetus is feet first) and vertex (*i.e.,* head first), both of which are longitudinal positions, and transverse lie, a latitudinal position. (Tr. 277:13–15 (Grunebaum); 462:19–22 (Johnson).) Therefore, when a physician converts a fetus to a footling breech position, the fetus is turned either 180–degrees (if the fetus had

been in a vertex position) or 90–degrees (if the fetus had been in a transverse lie). (Tr. 277:16–18 (Grunebaum).) Plaintiffs offered testimony at trial that the risks of converting a fetus to a footling breech position during live-birth (also called internal podalic version) are not comparable to the risks presented during an abortion because: (1) during a live-birth the well-being of the fetus is the primary concern, whereas this is not the case during an abortion; (2) the fetus is ten times larger than a fetus during a previability abortion; and (3) the uterus is much thinner and thus more susceptible to damage during a term pregnancy. (Tr. 279:2–280:7 (Grunebaum); Tr. 462:19–463:19 (Johnson); Tr. 599:25–602:12 (Hammond).)

rhaging due to the doctor blindly forcing a sharp instrument into the base of the fetal skull in a D & X." § 2(14)(A), Pub.L. No. 108–105, 117 Stat. 1201, 1206. Plaintiffs assert that during a D & X, a physician does not "blindly" force a sharp instrument into the fetus's skull, but rather the physician positions the fetus in order to observe what he or she is doing. (Tr. 604:25–605:4 (Hammond) ("If I have done a procedure that is intact enough that we have delivered the fetus intact to the level of the head, where only the head remains above the level of the internal opening of the cervix, I can actually see at this point the back of the neck of the fetus."); Tr. 799:3–8 (Westhoff) ("With a[D & X], when we put a hole into the base of the skull we can generally do that under direct visualization because the base of the skull is, thanks to traction, held right in the cervical opening. And so it is, in my experience and my opinion, less risky to put a hole in the base of the skull."); Tr. 1573:7–13 (Chasen) ("And, in most [D & X procedures], the degree of cervical dilation will not accommodate passage of the fetal head through the cervix. And in this case my practice is to make an incision at the base of the skull with the scissors, which I can do really under direct visualization, place a suction device within the skull, the brain tissue is aspirated and, typically, the head then delivers easily."); Tr. 1768:9–1769:2 (Lockwood) (testifying that during a D & X the fetus is "delivered to the point of the base on the neck being actually out beyond the level of the cervix" and that the physician can "actually physically look[ ] at the base of the fetal neck"); Tr. 2110:11–25, 2180:1–10 (Sprang) (testifying that according to the recent descriptions that he has read of D & X, "the head even comes out further and they have greater visibility of what they are doing" and "[c]learly, if there is greater visibility of what you are doing ... it is also going to be safer because you can see what you are do-

ing.").) Finally, physicians do not always pierce the fetal skull during a D & X. Instead, a physician may crush the head with forceps. (Tr. 466:9–15 (Johnson); Tr. 1005:3–6 (Westhoff); Tr. 1140:10–21, 1224:21–1225:3 (Frederiksen); Tr. 1678:17–1679:11 (Chasen).)

Some of the Government's own witnesses disagreed with certain findings. For example, Dr. Lockwood testified that he agrees with very little contained in the Act's findings section, (Tr. 1880:2–5 (Lockwood)); that he is unaware of any evidence that D & X is dangerous to the short- or long-term health of a woman, (Tr. 1880:23–1881:4 (Lockwood)); and that D & X is more or less comparable in safety to inductions and D & E, (Tr. 1881:5–7 (Lockwood)). Likewise, Dr. Clark testified that aside from Congress's findings on cervical incompetence, he disagreed that one could conclude that D & X carried an increased risk of uterine rupture, abruption, amniotic fluid embolus, and trauma to the uterus as a result of converting the child to a footling breech position. (Tr. 2419:3–2420:4 (Clark).) Dr. Bowes also testified that he is not aware of any reliable evidence that indicates that D & X poses greater risk of cervical incompetence, uterine rupture and trauma, abruption, and amniotic fluid embolus. (Tr. 2706:19–2707:17 (Bowes).) And Dr. Sprang testified that it has not been established that D & X abortions have more complications than D & Es. (Tr. 2151:23–25 (Sprang).)

## 2. Congress's Findings Regarding Other Aspects of "Partial–Birth Abortion"

In addition to its specific findings on the risks of partial-birth abortion, Congress also made other factual findings regarding the safety of the procedure. Congress, for instance, stated that there existed "[n]o controlled studies of partial-birth abortions ... [or] comparative studies ... to demon-

strate its safety and efficacy compared to other abortion methods." § 2(14)(B), 117 Stat. at 1206. The Chasen Study was completed after Congress made this finding.

Congress also found, however, that "there are currently no medical schools that provide instruction on abortions that include the instruction in partial-birth abortions in their curriculum." § 2(14)(B), 117 Stat. at 1206. There was trial testimony that the procedure is taught at some of the leading medical schools in the country, including New York University, Columbia, Cornell, Northwestern, and Albert Einstein College of Medicine. (Tr. 752:20–753:25, 897:10–898:10 (Westhoff); 284:23–286:7 (Grunebaum); Tr. 1556:19–25 (Chasen); 1046:3–11 (Frederiksen); Tr. 1812:5–13 (Lockwood); Tr. 2150:3–24 (Sprang).) Moreover, Dr. Lockwood, currently the head of Yale University Medical School's Department of Obstetrics and Gynecology, testified that he intends to develop a program at Yale which would teach the procedure. (Tr. 1727:1–10, 1800:19–1801:3, 1881:17–20 (Lockwood).)

Plaintiffs also argue that there is no support for Congress's finding that D & X is not "embraced by the medical community, particularly among physicians who routinely perform other abortion procedures"; is "disfavored"; "lies outside the standard of medical care"; and is not recognized as "a valid abortion procedure." §§ 2(2), (13), (14)(O), 117 Stat. at 1206. Arguing that these findings are patently false, Plaintiffs point to testimony that the majority of professional medical organizations, such as ACOG, AMWA, and APHA, accept and support the procedure. (See, e.g., 149 Cong. Rec. S12921 (daily ed. Oct. 21, 2003) (letter from Ralph Hale, M.D., Exec. V.P. of ACOG, reaffirming and attaching ACOG Policy Statement; Statement on Intact Dilation and Extraction (Jan. 12, 1997)); March 2003 Hearing at 201 (letter

from Lynn Epstein, President of AMWA); 149 Cong. Rec. S11596–97 (daily ed. Sept. 17, 2003) (statement of APHA).)

Expert testified that D & X is within the standard of accepted medical care. (Tr. 609:12–21 (Hammond); 896:3–897:3, 907:7–12 (Westhoff); Tr. 2706:8–15; 2714:14–23 (Bowes); Tr. 2150:11–24 (Sprang).) Finally, Plaintiffs argue that leading medical schools teach the procedure and that major medical textbooks discuss it, as proof undermining Congress's factual findings that the procedure is disfavored and unrecognized in the mainstream medical community. (Tr. 610:15–24 (Hammond); Tr. 752:20–753:25, 758:10–20, 897:10–898:10 (Westhoff); Tr. 284:23–286:7 (Grunebaum); Tr. 1556:19–25 (Chasen); Tr. 1046:3–11 (Frederiksen); Tr. 477:17–478:9 (Johnson); Tr. 1812:5–13 (Lockwood); Tr. 2150:3–24 (Sprang); (Clinician's Guide).)

## II. FINDINGS OF FACT

The Court finds that the testimony at trial and before Congress establishes that D & X is a gruesome, brutal, barbaric, and uncivilized medical procedure. Dr. Anand's testimony, which went unrebutted by Plaintiffs, is credible evidence that D & X abortions subject fetuses to severe pain. Notwithstanding this evidence, some of Plaintiffs' experts testified that fetal pain does not concern them, and that some do not convey to their patients that their fetuses may undergo severe pain during a D & X. Additionally, some of Plaintiffs's experts do not make full disclosures to women about what D & X entails.

Furthermore, the Government's expert witnesses reasonably and effectively refuted Plaintiffs' proffered bases for the opinion that D & X has safety advantages over other second-trimester abortion procedures. The Government's experts, especially Dr. Clark, demonstrated that some of Plaintiffs' reasons necessitating D & X

are incoherent; other reasons were shown to be merely theoretical.

For example, Dr. Clark explained that peripartum cardiomyopathy, which Dr. Westhoff identified as a condition that would necessitate D & X for certain women, by definition, will develop only after the second trimester, when she claims to perform D & X abortions. Dr. Clark also cogently explained why acute fatty liver of pregnancy and Von Willebran's Disease[28] do not require a physician to use D & X. Likewise, Dr. Clark explained that despite Dr. Johnson's testimony that fluid shifts might be relevant to the selection of a second-trimester abortion method, major fluid shifts will occur only after pregnancy has ended. In no case involving these or other maternal health conditions could Plaintiffs point to a specific patient or actual circumstance in which D & X was necessary to protect a woman's health.[29]

The testimony also demonstrated that many of the purported safety advantages of D & X are only theoretical. For example, Dr. Clark convincingly testified that the decreased number of instruments passes as compared to D & E does not significantly reduce the danger of uterine perforation, nor are there any studies proving that fewer passes of dull forceps make D & X safer for women. Fewer bony parts, less procedure time, and reduced exposure to anesthesia are also advanced as reasons for which D & X is safer, but no studies prove these theories and these advantages do not rise above the realm of the hypothetical. Intuition does not equate to scientific fact.

After hearing all of the evidence, as well as considering the record before Congress, the Court does not believe that many of Plaintiffs' purported reasons for why D & X is medically necessary are credible; rather they are theoretical or false. In addition, Dr. Chasen's study was initiated with the knowledge that Congress was considering a partial-birth abortion ban. Not only did the study fail to prove the alleged safety advantages of D & X over D & E, it raised serious questions about the potential health risks to women that D & X poses, namely, the risk of future preterm births due to increased cervical dilation during a D & X.

Nevertheless, the Court also finds that a significant body of medical opinion—consisting of physicians who expressed their views at trial and before Congress, and medical organizations representing experts in the field—holds that D & E has safety advantages over induction and that D & X has some safety advantages (however hypothetical and unsubstantiated by scientific evidence) over D & E for some women in some circumstances.

There exists a division of medical opinion regarding whether D & E offers safety advantages over induction abortions prior to eighteen to twenty weeks' gestation. Among the reasons cited for this opinion are the shorter procedure time in D & E, and a decreased risk of blood loss and infection. D & E and induction, however, are of comparable safety between twenty and twenty-four weeks' gestation.

There is a division of medical opinion about whether D & X has safety advantages over D & E because the number of

---

**28.** Dr. Johnson identified Von Willebran's Disease as an auto-immune disorder; Dr. Clark, however, explained that it is a congenital clotting disorder.

**29.** Dr. Clark also explained that certain medical conditions identified by Plaintiffs' experts would never be cause to terminate a pregnancy. For instance, he explained that despite Plaintiffs' claims that women must undergo abortions if they develop kidney disease, lung disease or cancer, such conditions do not require that a pregnancy be terminated.

instrument passes are reduced, thereby decreasing the risk of perforating the uterus. Uterine perforation poses a threat to a woman's health because it can cause bleeding and infection and can harm a woman's internal organs. During a D & X, the physician does not insert the forceps into the woman as many times as occurs during a D & E because the physician is not tearing the fetus into pieces before removing the fetal parts. There is a division of medical opinion about whether the process of tearing the fetus into parts during a D & E may expose the woman to cervical laceration and uterine perforation because of sharp fetal bone and skull pieces. According to some physicians, D & X may reduce the risk of injury to the uterus and cervix because there may be less risk of sharp fragmentation when the fetus is removed intact.

There is also a division of medical opinion about whether D & X reduces the risk that parts of the fetus will be left in the uterus after the procedure, something that may be more likely to occur when the fetus is removed in parts during a D & E. The retention of fetal parts poses a health risk because it can lead to infection, bleeding, and, potentially, infertility. However, the use of ultrasound after D & E may reduce the risk of leaving fetal parts inside the uterus. D & X also requires less operating time, which some physicians believe may reduce the amount of maternal bleeding and the risk of infection. Additionally, the shorter operating time means that the woman is under anesthesia for a shorter period. Some physicians explained that less exposure to anesthesia is safer for the woman because there may be a decreased likelihood of complications.

There is a division of medical opinion about whether D & X is safer for women with uterine scarring, placenta previa, preeclampsia, bleeding disorders, and infections. The evidence also establishes a disagreement about whether D & X brings a lower risk of infection than D & E and induction because there are fewer instrument passes in D & X and a shorter operating time.

There is disagreement in the medical community about whether D & X is preferable to D & E and induction for women with prior uterine scarring because those women are at risk of uterine perforation and rupture, both of which pose a danger to women's health. The evidence also shows a division concerning whether D & X has safety advantages over other second-trimester abortion procedures for women carrying a hydrocephalic fetus because the fetal head is difficult to grasp with forceps and difficult to pass through the cervix.

There is further disagreement about whether a physician could utilize the techniques of D & X without violating the Act if the physician causes fetal demise before performing the D & X by injecting KCl or digoxin into the fetus. According to some experts, effectuating fetal demise before performing a D & X through the use of KCl or digoxin is an unnecessary procedure that may subject a woman to a slight risk of infection. Thus, there is a difference of medical opinion about whether the injection of KCl or digoxin to cause fetal demise is of any medical benefit to the woman and may present complications.

Professional medical associations have also expressed their view that D & X may be the safest procedure for some women. One of these groups, ACOG, has stated that D & X may be the most appropriate abortion procedure to protect a woman's health, but not the only safe procedure available. The twenty-member ACOG Executive Board approved the policy statement regarding D & X; its members never voted to approve the policy statement.

Significantly, ACOG refused to appear through a representative at this trial.

AMWA has also articulated its view that D & X may be the safest abortion procedure available to preserve a woman's health. AMWA, like ACOG, submitted an amicus brief to the Supreme Court in *Stenberg*. APHA opposes the Act because it lacks a health exception for circumstances in which a physician determines that it is the safest procedure to preserve a woman's health.

In 1997, a committee convened by the AMA Board of Trustees stated that D & X should not be used unless alternatives pose materially greater risks to the woman. However, in a later report, the AMA Board of Trustees stated that D & X may minimize trauma to the uterus, cervix, and other organs. Other organizations of public-health professionals supported the Act, concluding that D & X is never medically necessary to protect a woman's health and may pose potential health threats to a woman. Thus, Congress had before it a disagreement among professional organizations about the safety benefits of D & X.

The Court also finds that Congress did not hold extensive hearings, nor did it carefully consider the evidence before arriving at its findings. Congress only held two hearings after the Supreme Court issued its opinion in *Stenberg*. Those hearings were held before the 107th and 108th Congresses. Three physicians testified at those hearings, which lasted three hours, and only two of them were witnesses who had not previously testified before Congress regarding versions of the Act. In the eight years that Congress heard testimony regarding the Act, it held less than twenty-four hours of hearings and heard seven physicians testify live about the safety of D & X. This Court heard more evidence during its trial than Congress heard over the span of eight years. This Court also heard the testimony of more physicians regarding the safety of D & X than Congress did. Even the Government's own experts disagreed with almost all of Congress's factual findings.

The written record before Congress included statements from medical associations such as ACOG, AMWA, APHA, MMA, CMA, and ARHP expressing the organizations' belief that D & X has safety advantages over alternative procedures, while PHACT and AAPS supported the proposed ban. The written statements and letters that Congress received from physicians specializing in obstetrics and gynecology further evidence a division of medical opinion about the safety advantages of D & X.

Although the Court finds that the Government's experts offered testimony that was highly credible and reasoned, the Court cannot ignore that the evidence indicates a division of medical opinion exists about the necessity of D & X to preserve women's health. There is no consensus that D & X is never medically necessary, but there is a significant body of medical opinion that holds the contrary. The evidence indicates that the same disagreement among experts found by the Supreme Court in *Stenberg* existed throughout the time that Congress was considering the legislation, despite Congress's findings to the contrary.

## III. CONCLUSIONS OF LAW

### A. The Court Only Reaches the Health–Exception Issue

■ To decide this case, the Court need only reach the health-exception challenge. Although the parties have expended considerable time and effort arguing the other bases for which Plaintiffs allege the Act may be unconstitutional, the Court believes it prudent to refrain from making constitutional rulings that are unnecessary

to the resolution of the case. "[There exists an] obligation of the Judicial Branch to avoid deciding constitutional issues needlessly." *Christopher v. Harbury,* 536 U.S. 403, 417, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002); *see also Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1932) (Brandeis, J., concurring) (" 'It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of a case.' ") (quoting *Burton v. United States,* 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905)).

The Act as a whole cannot be sustained because it does not provide for an exception to protect the health of the mother; addressing the other alleged constitutional defects is unnecessary to the resolution of this case. Therefore, this opinion will not address the alternative arguments that Plaintiffs have raised.

### B. Level of Deference Owed to Congressional Findings

As a threshold matter, the Court must determine the appropriate level of deference owed to Congress's factual findings. The Government contends that the Court's " 'sole obligation is to assure that, in formulating judgments, Congress has drawn reasonable inferences based on substantial evidence.' " (Gov't Proposed Conclusions of Law ¶ 2 (quoting *Turner Broad. Sys., Inc. v. FCC,* 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) [*"Turner II"*]).) Plaintiffs, on the other hand, argue that the evidentiary standard established in *Stenberg* is incompatible with *Turner*'s deferential standard.

In *Turner II,* the Supreme Court considered the constitutionality of the Cable Television Consumer Protection and Competition Act of 1992 ("Cable Television Act"), Pub.L. No. 102–385, 106 Stat. 1460, which required cable television systems to dedicate some of their channels to local television stations. *See* 520 U.S. at 185,

117 S.Ct. 1174. The Court had previously held that these "must-carry" provisions were content-neutral restrictions on speech that under First Amendment doctrine must satisfy intermediate scrutiny. *See Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 649, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (*"Turner I"*). Thus, the provisions would be constitutional if they furthered " 'an important or substantial governmental interest ... [that was] unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms [was] no greater than is essential to the furtherance of that interest.' " *Id.* at 662, 114 S.Ct. 2445 (quoting *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). Congress had found that the must-carry provisions would preserve the benefits of free broadcast television, promote widespread dissemination of information from a variety of sources, and promote fair competition. *Id.*

The *Turner I* Court remanded the case for further factual development in the district court, which had granted summary judgment. *See id.* at 667, 114 S.Ct. 2445. In doing so, a plurality of the Supreme Court agreed that "courts must accord substantial deference to the predictive judgments of Congress" because "Congress is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon an issue as complex and dynamic" as that presented in *Turner. Id.* at 665, 114 S.Ct. 2445 (internal quotation marks and citation omitted).

In *Turner II,* the Supreme Court again addressed the level of deference owed to congressional factfinding. The Court stated that, in reviewing the constitutionality of a statute, courts must accord substantial deference to Congress, and must merely assure that Congress has drawn reasonable inferences based on substantial evidence. 520 U.S. at 195, 117 S.Ct. 1174.

The Court emphasized that deference was particularly appropriate in reviewing Congress's findings in the Cable Television Act:

This principle has special significance in cases, like this one, involving congressional judgments concerning regulatory schemes of inherent complexity and assessments about the likely interaction of industries undergoing rapid economic and technological change. Though different in degree, the deference to Congress is in one respect akin to deference owed to administrative agencies because of their expertise.

*Id.* at 196, 117 S.Ct. 1174. The judiciary owed deference to the legislature's findings as to "the harm to be avoided and to the remedial measures adopted for that end, lest [courts] infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy." *Id.* Multiple reasons, however, suggest that the *Turner* rationale does not apply here.

The substantive constitutional issue in *Turner* called for only intermediate scrutiny. The must-carry provisions in *Turner* were content-neutral restrictions on speech because they did not distinguish favored from disfavored speech, prompting an intermediate level of scrutiny from the Court. *See Turner II*, 520 U.S. at 185–86, 117 S.Ct. 1174. Intermediate scrutiny, which is itself a fairly deferential standard of review, is not applicable when legislation substantially burdens a fundamental right. *See, e.g., Turner II*, 520 U.S. at 225, 117 S.Ct. 1174 (Stevens, J., concurring) ( "If this statute regulated the content of speech rather than the structure of the market, our task would be quite different."); *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) ("[C]lassifications affecting fundamental rights ... are given the most exacting scrutiny."); *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843, 98 S.Ct.

1535, 56 L.Ed.2d 1 (1978) ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake."). Had the must-carry provisions distinguished based on the content of speech, they would have been subjected to strict scrutiny, the Court's most nondeferential standard. *See Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) (applying strict scrutiny to FCC regulations banning indecent telephone communications).

■ The Supreme Court has held that abortion of a nonviable fetus, as a form of personal privacy, is a fundamental right found in the due process guarantee of liberty. *See Roe*, 410 U.S. at 153–54, 93 S.Ct. 705. While the plurality in *Casey* held that undue burden, and not strict scrutiny, was the test for evaluating the constitutionality of abortion regulations, it reaffirmed that there was a fundamental liberty right against unwarranted government interference in aborting a nonviable fetus. *See* 505 U.S. at 875–77, 112 S.Ct. 2791. Such substantial deference to Congress's factfindings would not comport with the Supreme Court's treatment of statutes burdening fundamental rights, whether the constitutional test is "the most exacting scrutiny," *see Clark*, 486 U.S. at 461, 108 S.Ct. 1910, or undue burden.

■ While the *Turner* Court imposed a low burden on Congress's predictions, it has not been so deferential to congressional factfinding in other cases evaluating the constitutionality of congressional statutes, even when strict scrutiny did not apply. *See, e.g., United States v. Morrison*, 529 U.S. 598, 614–15, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (striking down Violence Against Women Act on rational basis review, despite Congress's detailed findings that gender-based violence substantially affects interstate commerce, because "the existence of congressional findings is not

sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation"). Moreover, at issue here are findings of constitutional fact, those "upon which the enforcement of the constitutional rights of the citizen depend." *See Crowell v. Benson,* 285 U.S. 22, 56, 60, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ("In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function."). Justice Thomas, while a judge on the Court of Appeals for the District of Columbia Circuit, eloquently explained why legislative findings of constitutional fact are not entitled to substantial deference:

> We know of no support ... for the proposition that if the constitutionality of a statute depends in part on the existence of certain facts, a court may not review a legislature's judgment that the

facts exist. If a legislature could make a statute constitutional simply by "finding" that black is white or freedom, slavery, judicial review would be an elaborate farce. At least since *Marbury v. Madison* ... that has not been the law. *Lamprecht v. FCC,* 958 F.2d 382, 392 (D.C.Cir.1992).

And this is not a case in which Congress has found facts on a clean slate. Instead, Congress's findings were an expression of disagreement with an Article III court's findings. Congress stated, "In reaching [its] conclusion, the Supreme Court deferred to the Federal district court's factual findings .... However, substantial evidence presented at the Stenberg trial and overwhelming evidence presented and compiled at extensive congressional hearings ... not included in the Stenberg trial record [established that the district court's findings were incorrect]." Act § 2(4)-(5), 117 Stat. at 1202.[30]

---

**30.** While Congress maintained in its findings that the Supreme Court merely reviewed the district court's findings for "clear error," *see* Act, § 2(6)-(7), 117 Stat. at 1202, nowhere does the Supreme Court invoke that appellate standard of review. The Supreme Court did rely on the district court findings, but only as one factor among five "medically related evidentiary circumstances." *See Stenberg,* 530 U.S. at 937, 120 S.Ct. 2597. In addition, the Court relied on amici submissions not before the district court as well as the factual conclusions of other district courts considering partial-birth abortion statutes. *See, e.g., id.* at 923, 120 S.Ct. 2597 ("drawing upon the findings of the trial court, underlying testimony, and related medical texts" to describe abortion methods); *id.* at 932, 934–36, 120 S.Ct. 2597 (considering arguments of amici for and against Nebraska's ban); *id.* at 932–33, 120 S.Ct. 2597 (citing findings of seven other district courts). The district court's findings did not represent adjudicatory facts, those that relate only to the current parties, but legislative facts, those that apply generally and universally. *See United States v. Gould,* 536 F.2d 216, 220 (8th Cir.1976) ("Legislative facts are established truths, facts or pronouncements

that do not change from case to case but apply universally, while adjudicative facts are those developed in a particular case."). Whether D & X is ever necessary to protect women's health is not a fact that will differ from trial to trial, but must be found by courts as a matter of legislative fact. *See A Woman's Choice–E. Side Women's Clinic v. Newman,* 305 F.3d 684, 688 (7th Cir.2002) ("[C]onstitutionality [of partial-birth abortion statutes] must be assessed at the level of legislative fact, rather than adjudicative fact determined by more than 650 district judges. Only treating the matter as one of legislative fact produces the nationally uniform approach that *Stenberg* demands."); *Hope Clinic v. Ryan,* 195 F.3d 857, 859 (7th Cir.1999) (Posner, J., dissenting) ("The health effects of partial birth abortion should indeed be treated as a legislative fact, rather than an adjudicative fact, in order to avoid inconsistent results arising from the reactions of different district judges ... to different records."), *majority opinion vacated,* 530 U.S. 1271, 120 S.Ct. 2738, 147 L.Ed.2d 1001 (2000). Applying a clearly erroneous standard to findings of legislative facts would undermine the requirement of uniformity under *Stenberg* because it would

The Supreme Court has struck down congressional legislation passed in response to a controversial judicial decision. *See City of Boerne v. Flores,* 521 U.S. 507, 535, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (striking down Religious Freedom Restoration Act ("RFRA") as an unconstitutional attempt by Congress to "alter the meaning of the Free Exercise Clause," as interpreted by the Supreme Court). The Court in *City of Boerne* considered a slightly different, though analogous, issue—congressional legislation disagreeing with a constitutional interpretation. *See Employment Div. v. Smith,* 494 U.S. 872, 878, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (holding Free Exercise Clause does not require exceptions to neutral, generally applicable laws to accommodate individuals' religious practices). As the Supreme Court in *City of Boerne* put it:

> When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including *stare decisis,* and contrary expectations must be disappointed.

521 U.S. at 536, 117 S.Ct. 2157. After *Smith,* Congress passed the RFRA with the finding that the Supreme Court "virtually eliminated the requirement that the government justify burdens on religious exercise," and sought to restore the constitutional standard that *Smith* replaced. RFRA, 42 U.S.C. § 2000bb(a)(4), (b)(1). The Supreme Court saw this as an impermissible encroachment upon its Article III powers. *See* 521 U.S. at 535, 117 S.Ct. 2157.

Unlike the statute in *Turner,* in which Congress exercised original, predictive judgment about the marketplace, but similarly to the RFRA, the Act here is an expression of Congress's disagreement with how the judiciary has exercised its authority. This case deals with factual findings rather than legal interpretation; however, it would also infringe upon the constitutional role of the judiciary if Congress could simply tell the federal courts that their findings are wrong and receive substantial deference in order to prove it.

Finally, *Turner* and *Stenberg* are fundamentally at odds. The Supreme Court in *Stenberg* implicitly rejected deference to the institutional competency of legislatures, at least when abortion regulations are concerned. The evidentiary standard established by the Supreme Court does not permit the government to legislate in the face of medical uncertainty. *See Stenberg,* 530 U.S. at 937–38, 120 S.Ct. 2597. Justices Thomas and Kennedy, in their dissenting opinions, recognized that barring legislative action when there is no consensus on an abortion procedure disregards the Court's traditional respect for legislatures' superior resources and fact-finding capabilities. *See* 530 U.S. at 970, 120 S.Ct. 2597 (Kennedy, J., dissenting); 530 U.S. at 1017–18, 120 S.Ct. 2597 (Thomas, J., dissenting). It would be inconsistent to resurrect the very deference that the Supreme Court rejected in *Stenberg* when determining whether Congress was correct in its findings that the *Stenberg* standard is satisfied.

Additionally, *Stenberg*'s holding would not permit a ban without a health excep-

---

mean that the Supreme Court could uphold one trial court's determination that an abortion procedure is never medically necessary while upholding another's that it is necessary to protect women's health. *Cf. Lockhart v.*

*McCree,* 476 U.S. 162, 170 n. 3, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (noting "clearly erroneous" standard is inconsistent with need to produce uniform findings of legislative facts).

tion in the face of a "significant body of medical opinion" articulating the reasons why an abortion procedure has safety advantages. *See* 530 U.S. at 937, 120 S.Ct. 2597. The *Turner* standard explicitly holds that Congress could disregard evidence contrary to its findings provided that the position it accepted was reasonable and based on substantial evidence. *See Turner II*, 520 U.S. at 210–11, 117 S.Ct. 1174 (stating presence of contradictory evidence before Congress does not render its findings invalid).

■ These reasons make it highly doubtful that Congress's findings are entitled to the level of deference that the Government asserts. The standard of review that a court must employ when reviewing congressional findings of fact under the circumstances involved here, however, has not been established by a higher court. In this suit, it is Congress's factual findings and not its interpretation of the Constitution that is at odds with Supreme Court precedent. Rather than seek to confront a question not yet resolved by a higher court, this Court will apply the *Turner* standard be-

cause it concludes that, even under that standard, the Act is unconstitutional for lack of a health exception. *See Planned Parenthood*, 320 F.Supp.2d at 1013–13 (expressing doubt that *Turner* applies to review of Congress's findings in the Act but concluding that the Act fails even applying *Turner*).

## C. The Act Requires a Health Exception

■ The Supreme Court in *Stenberg* held that a statute which prohibits the performance of a particular abortion procedure must include an exception for circumstances in which the procedure is necessary, in appropriate medical judgment, to preserve a woman's life and health. *See* 530 U.S. at 938, 120 S.Ct. 2597. This requirement is separate from the Court's conclusion that the government must not place an undue burden on a woman's right to choose a previability abortion.[31] *See id.* at 930, 120 S.Ct. 2597 (holding the statute unconstitutional "for at least two independent reasons"). The Act, like the statute in *Stenberg,* is unconstitutional because it does not provide this exception.[32]

---

**31.** *Casey* recognized that the government has a substantial interest in promoting and protecting fetal life. *See* 505 U.S. at 875–76, 112 S.Ct. 2791. That interest is considerably stronger after the point of viability. *See Stenberg,* 530 U.S. at 930, 120 S.Ct. 2597; *Casey,* 505 U.S. at 880, 112 S.Ct. 2791. But, according to the Supreme Court, the government's substantial interest in protecting fetal life postviability cannot override the mother's right to abort the fetus "where it is necessary, in appropriate medical judgment, for the preservation of the [mother's] life or health." *Casey,* 505 U.S. at 879, 112 S.Ct. 2791 (quoting *Roe,* 410 U.S. at 164–65, 93 S.Ct. 705). "Since the law requires a health exception in order to validate even a postviability abortion regulation, it at a minimum requires the same in respect to previability regulation." *Stenberg,* 530 U.S. at 930, 120 S.Ct. 2597. This Act, like Nebraska's statute struck down in *Stenberg,* makes no distinction between pre-

and postviability abortions, thus "aggravat[ing] the constitutional problem presented." *Id.*

**32.** Although this case involves a challenge to federal legislation which must be tested against the restraints of the Fifth Amendment Due Process Clause, while *Stenberg* invalidated a state statute under the Due Process Clause of the Fourteenth Amendment, the Supreme Court has generally interpreted the clauses to be coextensive. *See, e.g., Paul v. Davis,* 424 U.S. 693, 702 n. 3, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (applying precedents decided under both due process clauses because "the Fourteenth Amendment imposes no more stringent requirements upon state officials than does the Fifth upon their federal counterparts"); *Screws v. United States,* 325 U.S. 91, 123, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) ("The Fifth Amendment contains a due process clause as broad in its terms restrict-

The Government contends that the lack of a health exception does not make the Act unconstitutional if, looking at the congressional record supplemented by the trial testimony, the Court determines that Congress was reasonable in its finding that D & X is never medically necessary to protect a woman's health. *Stenberg* does not countenance that approach. Instead, the relevant inquiry (assuming, as the Court does, that *Turner* applies) is whether Congress reasonably determined, based on substantial evidence, that there is no significant body of medical opinion believing the procedure to have safety advantages for some women. *See Stenberg,* 530 U.S. at 937, 120 S.Ct. 2597. Under that standard, Congress's factfindings were not reasonable and based on substantial evidence.

The ultimate conclusion reached by Congress is that there exists a "moral, medical, and ethical consensus" that D & X "is never medically necessary and should be prohibited." Act, § 2(1), 117 Stat. at 1201. The congressional record itself undermines this finding. Present in the congressional record are the statements of AAPS and PHACT, two medical organizations which supported the ban. In addition, Congress had before it the testimony of Drs. Smith, Romer, Cook, Aultman, and Neerhof, each of whom expressed the medical opinion that a health exception is unnecessary. Yet, the congressional record also contains contradictory views. For example, nine medical associations, including ACOG, CMA, PRCH, AMWA, and APHA opposed the Act because, they stated, D & X provides safety advantages for some women. In fact, the Supreme Court in *Stenberg* singled-out the views of ACOG as the sort of qualified medical opinion that should be weighed in considering the safety of D & X. *See Stenberg,* 530 U.S. at 937, 120 S.Ct. 2597 ("And *Casey*'s words appropriate medical judgment must embody the judicial need to tolerate responsible differences of medical opinion—differences of a sort that the American Medical Association and the American College of Obstetricians and Gynecologists' statements together indicate are present here.").

Obstetricians and gynecologists who have performed D & X abortions, such as Drs. Creinin, Koplik, Scommegna, and Darney, submitted letters regarding their views on the need for a health exception.

ing national power as the Fourteenth is of state power."); *Curry v. McCanless,* 307 U.S. 357, 370, 59 S.Ct. 900, 83 L.Ed. 1339 (1939) ("[T]he due process clause of each amendment is directed at the protection of the individual and he is entitled to its immunity as much against the state as against the national government."). Both clauses protect against deprivations of a person's liberty without due process of law. *See* U.S. Const. amends. V, XIV. And the Supreme Court has construed both clauses to include substantive protections. *See Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("We have long recognized that the [Fourteenth] Amendment's Due Process Clause, like its Fifth Amendment counterpart, guarantees more than fair process. The Clause also includes a substantive component that provides heightened protection against govern-

ment interference with certain fundamental rights and liberty interests." (internal quotation marks and citations omitted) (citing *Washington v. Glucksberg,* 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (involving substantive due process rights under the Fourteenth Amendment), and *Reno v. Flores,* 507 U.S. 292, 301–02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (involving substantive due process rights under the Fifth Amendment))).

There is no persuasive textual, precedential, or principled argument suggesting that the states may not ban D & X without a health exception but that the federal government may. If there is a due process right to abortion, as the Supreme Court has held that there is, then the constitutional restrictions on regulating abortion apply equally to the federal government as to the states.

(*See, e.g.,* 141 Cong. Rec. H 11610 (daily ed. Nov. 1, 1995) (letter from Dr. Creinin); *id.* (letter from Dr. Koplik); 141 Cong. Rec. S17892 (daily ed. Dec. 4, 1995) (letter from Dr. Scommegna); 149 Cong. Rec. S3600 (statement of Dr. Darney).) In light of the opposing statements within the congressional record, it was unreasonable to conclude that a consensus within the medical community believes that D & X is never medically necessary.

Testimony adduced at trial bolsters this conclusion. Testimony of both Plaintiffs' and the Government's experts established that no consensus exists. For instance, Dr. Bowes, a Government-designated expert, acknowledged that: (1) there does not exist a consensus in the medical community that D & X is never medically necessary; (2) there exists a debate in the medical community as to whether D & X is the safest procedure for some women in some circumstances; and (3) responsible groups of physicians are on both sides of this debate. (Tr. 2700:2–11, 2714:14–23 (Bowes).)

Likewise, Congress was unreasonable to conclude that there is "no credible medical evidence that partial birth abortions are … safer than other procedures." Act, § 2(14)(B), 117 Stat. at 1204. Congress had before it the same body of evidence that the Supreme Court deemed to amount to a "significant body of medical authority [that] believes D & X may bring with it greater safety for some patients." *Stenberg,* 530 U.S. at 937, 120 S.Ct. 2597. Yet, Congress found this same body of evidence not credible. For example, despite the Court's conclusions in *Stenberg,* Congress discounted the ACOG policy statement. *Compare id.* (discussing views of ACOG in reasoning that a D & X offered safety advantages for some women), *with* Act, § 2(14)(B), 117 Stat. at 1204 (finding no credible evidence was before it regarding the safety advantages of D & X). Con-

gress also did not credit the oral testimony and letters of over twenty physicians, which emphasized that D & X may be the safest procedure to preserve maternal health. (*See, e.g.,* March 2003 Hearing at 100–01 (statement of Dr. Darney); *id.* at 191–95 (statement of Dr. Davis); 149 Cong. Rec. S11597–98 (statement of Drs. Roche and Weiss on behalf of PRCH).) The congressional record thus demonstrates that "a significant body of medical opinion" supports the notion that D & X offers some safety advantages. *See Stenberg,* 530 U.S. at 937, 120 S.Ct. 2597.

In addition, an examination of the congressional record and testimony presented at trial demonstrates that several of Congress's other factual findings are unsupported. First, for example, Congress concluded that women undergoing a D & X face an increased risk of uterine rupture, abruption, amniotic fluid embolus, and trauma to the uterus because the fetus must be converted to a footling breech position. *See* Act, § 2(14)(A), 117 Stat. at 1204. Experts for both sides labeled this finding inaccurate. For instance, testimony established that approximately only one-third of fetuses present in breech during the second-trimester, such that a physician does not necessarily convert the fetus to a breech position during a D & X. (*See, e.g.,* Tr. 1828:15–29:11 (Lockwood); Tr. 463:20–464:8 (Johnson).) Moreover, Plaintiffs' experts testified that some physicians will only perform a D & X on a fetus already in breech position. (*See, e.g.,* Tr. 261:6–12, 277:9–21 (Grunebaum); Tr. 1458:20–22 (Paul).)

Second, Congress found that while performing a D & X, a physician will blindly force a sharp instrument into the base of the fetal skull, creating a risk of maternal laceration and hemorrhaging. *See* Act, § 2(14)(A), 117 Stat. at 1204. Despite this finding, experts for both sides agree that

D & X does not involve the capricious and erratic use of instruments. Rather, experts for Plaintiffs and the Government detailed that if a physician desires to make an incision in the base of the fetal skull during a D & X, the physician will do so under direct visualization. (*See, e.g.,* Tr. 799:3–8 (Westhoff); Tr. 1768:9–1769:2 (Lockwood); Tr. 2110:11–25, 2180:1–10 (Sprang).) The testimony supplementing the congressional record also demonstrates that to perform a D & X a physician may crush the head with forceps, and therefore the procedure does not necessarily involve the piercing of the fetal skull. (*See, e.g.,* Tr. 466:9–15 (Johnson); Tr. 1678:17–1679:11 (Chasen).)

Third, as proof of its determination that the mainstream medical community disapproves of the procedure, Congress found that medical schools do not instruct students on partial-birth abortions. Act, § 2(14)(B), 117 Stat. 1204. Testimony at trial adduced that, contrary to Congress's finding, the procedure is taught at leading medical schools, such as New York University, Columbia, Cornell, Northwestern, and Albert Einstein College of Medicine. (*See, e.g.,* Tr. 1786:23–24, 1812:8–13 (Lockwood); Tr. 752:20–753:25, 897:10–898:10 (Westhoff); Tr. 1556:19–25 (Chasen); Tr. 1046:3–11 (Frederiksen); Tr. 2150:3–24 (Sprang).)

Finally, Congress concluded that D & X is a disfavored medical procedure that is not embraced by the medical community, "particularly among physicians who routinely perform other abortion procedures." Act, §§ 2(2), 13, 14(O), 117 Stat. at 1201, 1203–04, 1206. The face of the congressional record rebuts this finding. First, the record includes the statements of nine associations, including ACOG and APHA, which opposed the ban because they believe that the procedure offers safety advantages and might be medically necessary in the presence of certain maternal-health conditions and fetal anomalies. (*See, e.g.,* 149 Cong. Rec. S12921 (statement of ACOG); 149 Cong. Rec. S11596–97 (statement of APHA).) Second, the congressional record contains letters from numerous individual physicians—whose practices include performing abortions—stating that maternal health would be jeopardized under the Act. (*See, e.g.,* November 1995 Hearing at 103 (testimony of Dr. Robinson); November 1995 Hearing at 248 (statement of Dr. Hern); 149 Cong. Rec. S3600 (statement of Dr. Darney); March 2003 Hearing at 191–95 (statement of Dr. Davis).) Third, medical textbooks, which were included in the congressional record, discuss D & X as a medically recognized means to terminate a pregnancy. (*See, e.g.,* June 1995 Hearing at 48–62 (excerpt from *Williams Obstetrics*).) In light of such evidence, Congress unreasonably concluded that no physicians who perform abortion procedures favor D & X and that the procedure is unrecognized in the medical community.

Of course, also before Congress was testimony from those who supported the ban. For example, Dr. Smith testified that there were no obstetrical situations that would necessitate a partial-birth abortion to be performed to preserve maternal health. (November 1995 Hearing at 75–79.) Likewise, Dr. Aultman testified that partial-birth abortion is not medically necessary and that a ban on the procedure would not endanger women's health. (July 2002 Hearing at 6–9.) Also included in the congressional record are letters from physicians who supported the ban absent a health exception. (*See, e.g.,* March 2003 Hearing at 104 (letter of Dr. Bowes); March 2003 Hearing at 109–10 (letter of Dr. T. Murphy Goodwin).) PHACT detailed the medical reasons why it supported the ban, including its contention that the procedure is never medically indi-

cated and itself poses health risks to women. (July 2002 Hearing at 184, 236–45.)

The congressional record, encompassing the views of individual physicians and medical associations on both sides of the debate surrounding D & X, and as supplemented by the trial testimony, evidences a division of medical authority over the issue of whether D & X is generally safer than the alternatives. The Supreme Court has held that when there is such a division of medical opinion, a health exception is constitutionally required. *See Stenberg,* 530 U.S. at 937–38, 120 S.Ct. 2597.

■ The Government's other arguments, many of which echo congressional findings, also fail to save the Act. Indeed, most of its arguments were made by the state of Nebraska and rejected in *Stenberg.*

First, the Government argues that the medical conditions for which Plaintiffs claim D & X is safer are rare, as are the complications which might arise during alternative procedures. As the Supreme Court explained, however, "the health exception question is whether protecting women's health requires an exception for those infrequent occasions." *Stenberg,* 530 U.S. at 934, 120 S.Ct. 2597. The Court held that "the State cannot prohibit a person from obtaining treatment simply by pointing out that most people do not need it." *Id.*

Second, the Government's legitimate interests in preserving the integrity and ethics of the medical profession, showing concern for the unborn, and preventing a brutal procedure that coarsens society to humanity were asserted in *Stenberg* and rejected as insufficient to overcome the need for a health exception. Nebraska had similarly argued that its law showed concern for the unborn, prevented cruelty to partially born children, and preserved the integrity of the medical profession. *See id.* at 931, 120 S.Ct. 2597. The Court held that these substantial interests, just like the state interest in the potentiality of human life present in *Roe* and *Casey,* did not obviate the need for a health exception. *See id.*

Third, the Government (and Congress) asserts similar medically based arguments as those rejected in *Stenberg* because of the presence of a division of medical opinion. Those arguments are that D & E and ·induction are safe alternatives and that D & X creates potential health risks. The Supreme Court held that the disagreement among "highly qualified knowledgeable experts" on the comparative safety of D & X necessitated a health exception. *See id.* at 936–37, 120 S.Ct. 2597. As explained above, Congress was unreasonable in its finding that such a division does not exist.

Fourth, the absence of medical studies documenting the comparative safety of D & X and other abortion procedures is offered by the Government, was found by Congress, and was considered and rejected as a reason against the need for a health exception in *Stenberg.* The Court in *Stenberg* concluded that the lack of controlled medical studies was·a factor counseling *in favor of* a health exception.[33] *See id.* at 937, 120 S.Ct. 2597.

Finally, the Government argues that no health exception is required because Plaintiffs could not identify a single circumstance in which D & X was medically necessary. This argument fails for two reasons. The Supreme Court held that medically "necessary" does not mean absolutely necessary in unanimous medical opinion, but rather "appropriate (or inap-

---

**33.** The Chasen Study raises concerns about the safety of D & X, but because of its lack of statistical significance, it is not a conclusive study showing that D & X does or does not have safety advantages.

propriate) in light of estimated comparative health risks (and health benefits) in particular cases." *Id.* Thus, "medically necessary" is not so imposing a hurdle as the Government suggests. And, *Stenberg* does not require Plaintiffs, or the body of medical opinion of which they are a part, to demonstrate actual medical cases in which D & X was necessary. Instead, the standard only requires "a significant body of medical opinion [that] believes a procedure *may* bring with it greater safety for *some* patients and [that] explains the medical reasons supporting that view." *Id.* The dissenters in *Stenberg* articulated why that standard is so easy for physicians to satisfy, and so difficult for the Government to overcome. *See* 530 U.S. at 953, 120 S.Ct. 2597 (Scalia, J., dissenting) ("[D]emanding a 'health exception'—which requires the abortionist to assure himself that, in his expert medical judgment, this method is, in the case at hand, marginally safer than others . . .—is to give live-birth abortion free rein."); 530 U.S. at 967, 120 S.Ct. 2597 (Kennedy, J., dissenting) (asserting that the standard "limits its inquiry to the relative physical safety of the two procedures, with the slightest potential difference requiring the invalidation of the law"); 530 U.S. at 1009, 120 S.Ct. 2597 (Thomas, J., dissenting) (interpreting the standard to mean "unless a State can conclusively establish that an abortion procedure is no safer than other procedures, the State cannot regulate that procedure without including a health exception").

Thus, the Government's interest-based, medically based, and institutional competency arguments all fail to meaningfully distinguish the evidentiary circumstances present here from those that *Stenberg* held required a health exception to a ban on partial-birth abortion. The lack of a health exception also renders this Act unconstitutional. *See, e.g., Planned Parenthood,* 320 F.Supp.2d at 1033–34; *Planned Parenthood v. Owens,* 287 F.3d 910, 917–

18 (10th Cir.2002); *Hope Clinic v. Ryan,* 249 F.3d 603, 604 (7th Cir.2001); *Eubanks v. Stengel,* 224 F.3d 576, 577 (6th Cir.2000); *Causeway Med. Suite v. Foster,* 221 F.3d 811, 812 (5th Cir.2000); *Planned Parenthood v. Farmer,* 220 F.3d 127, 152 (3d Cir.2000) (Alito, J., concurring); *Richmond Med. Ctr. for Women v. Gilmore,* 219 F.3d 376, 377 (4th Cir.2000).

## IV.  CONCLUSION

While Congress and lower courts may disagree with the Supreme Court's constitutional decisions, that does not free them from their constitutional duty to obey the Supreme Court's rulings. As Judge J. Michael Luttig of the Court of Appeals for the Fourth Circuit stated in a concurring opinion soon after the Supreme Court decided *Stenberg:*

> As a court of law, ours is neither to devise ways in which to circumvent the opinions of the Supreme Court nor to indulge delay in the full implementation of the Court's opinions. Rather, our responsibility is to follow faithfully its opinions, because that court is, by constitutional design, vested with the ultimate authority to interpret the Constitution.

*Richmond Med. Ctr. for Women v. Gilmore,* 219 F.3d 376, at 378 (4th Cir.2000) (Luttig, J., concurring). Congress shares that same responsibility.

The Supreme Court in *Stenberg* informed us that this gruesome procedure may be outlawed only if there exists a medical consensus that there is no circumstance in which any women could potentially benefit from it. A division of medical opinion exists, according to *Stenberg,* according to this Court, and even according to the testimony on which Congress relied in passing this law. Such a division means that the Constitution requires a health exception.

*Stenberg* obligates this Court and Congress to defer to the expressed medical opinion of a significant body of medical authority. While medical science and ideology are no more happy companions than *Roe* and its progeny have shown law and ideology to be, *Stenberg* remains the law of the land. Therefore, the Act is unconstitutional.

For the foregoing reasons, Plaintiffs' application for a permanent injunction is GRANTED. The Attorney General of the United States, along with his officers, agents, servants, employees, successors, and all others acting in concert or participation with them are permanently enjoined from enforcing the Act against Plaintiffs, their members, officers, agents, servants, and employees.